**ST. JOHN'S HICKEY MEMORIAL HOSPITAL, INC., Plaintiff-Appellee,**

v.

**Joseph A. CALIFANO, Jr., Secretary of HEW, Defendant-Appellant.**

**Nos. 78–1825, 78–2203.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 16, 1979.

Decided June 1, 1979.

---

Robert C. Farrell, Health Care Financing and Human Development Services Division, Dept. of HEW, Washington, D. C., for defendant-appellant.

Stephen L. Gibson, Washington, D. C., for plaintiff-appellee.

Before CUMMINGS and TONE, Circuit Judges, and LEIGHTON, District Judge.*

CUMMINGS, Circuit Judge.

Plaintiff is a not-for-profit corporation located in Anderson, Indiana, where it operates a 333-bed acute care, general short-term hospital. It is both a provider of services and a hospital within the definitions of the Social Security Act.[1] In Count I of its complaint,[2] plaintiff has sued the Secretary of Health, Education and Welfare (Secretary) to recover amounts allegedly due because of the Secretary's refusal to permit plaintiff to include its joint nursing education costs of $86,760 in 1974 as allowable costs "for Medicare reimbursement purposes" (par. 27a of Count I).

Since July 1966, plaintiff has participated in the Medicare Program as a provider of services. During that period, Blue Cross of Indiana (formally known as Mutual Hospital Insurance, Inc.) has acted as the Secretary's agent with respect to Medicare reimbursement of Indiana hospitals. In its Medicare cost report for its fiscal year ended May 31, 1974, plaintiff included costs in the amount of $86,760 which it incurred as its portion of the costs of a joint nursing education program engaged in by plaintiff with Anderson College, also located in Anderson, Indiana.

In its audit of plaintiff's fiscal year 1974 cost report, under constraint of a policy statement of defendant's Bureau of Health Insurance issued in November 1975, Blue Cross treated these nursing education costs as nonallowable costs under the Medicare Program and therefore refused the amount of Medicare reimbursement payable to plaintiff. Defendant admits that since 32 per cent of the hospital services provided by plaintiff in that period were provided to Medicare beneficiaries, the Blue Cross disallowance of nursing education costs has denied plaintiff approximately $27,760 in Medicare reimbursement (par. 11 of Count I admitted in par. 1 of defendant's answer).

Medicare regulations provide that the cost of "approved educational activities" is an allowable cost under the Medicare Program. Such activities are defined in the Medicare regulations in part as follows:

"(b) *Definitions*—(1) *Approved educational activities.* Approved educational activities means formally organized or planned programs of study usually engaged in by providers in order to enhance the quality of patient care in an institution.

\*   \*   \*   \*   \*   \*

"(c) *Educational activities.* Many providers engage in educational activities including training programs for nurses, medical students, interns and residents, and various paramedical specialties. These programs contribute to the quality of patient care within an institution and are necessary to meet the community's needs for medical and paramedical personnel. It is recognized that the costs of such educational activities should be

---

\* Honorable George N. Leighton of the Northern District of Illinois is sitting by designation.

1. See Sections 1861(u) and (e) of the Social Security Act (42 U.S.C. §§ 1395x(u) and (e)).

2. The district court's decision with respect to Count II of the complaint is not involved in this appeal.

borne by the community. However, many communities have not assumed responsibility for financing these programs and it is necessary that support be provided by those purchasing health care. *Until communities undertake to bear these costs, the program will participate appropriately in the support of these activities.* Although the intent of the program is to share in the support of educational activities customarily or traditionally carried on by providers in conjunction with their operations, it is not intended that this program should participate in increased costs resulting from redistribution of costs from educational institutions or units to patient care institutions or units." (42 C.F.R. § 405.421(b) and (c); emphasis supplied.)

In 1950, plaintiff was affiliated with other hospitals and together they established the Holy Cross School of Nursing. From 1966 through 1973, plaintiff received reimbursement for the Medicare share of the cost of its participation in the Holy Cross program. However, allegedly "prompted by cost effectiveness considerations," in 1973 plaintiff initiated a joint nursing education program with Anderson College to replace its affiliation with the Holy Cross School of Nursing (par. 13 of Count I).

To avoid a proposed increase in its share of the $130,000 per year cost of the Holy Cross School of Nursing program and to increase the number of local resident nurses, plaintiff decided upon the joint program with Anderson College which required plaintiff to pay "the differential in the cost of educating nursing students represented by the cost of the clinical portion of the program [at the College] that was determined to be over and above the costs [for instructors] incurred by the College in providing education to non-nursing students" (par. 17 of Count I).[3] To cover such clinical

program costs, plaintiff agreed to provide "$36,000 toward start-up costs of the nursing education program, $70,000 to cover extra costs of the clinical program in the first academic year,[4] and $1,500 per student in each of the following four years, up to a maximum of $75,000 per year * * *" (par. 18 of Count I). Blue Cross advised plaintiff that the foregoing proposed payments to Anderson College would be allowable as reimbursable costs under the Medicare regulations. Therefore, plaintiff agreed to provide a clinical setting for the joint nursing education program and to bear the above-stated portion of the cost of the joint nursing education program. This resulted in plaintiff's paying Anderson College $86,760 as its agreed portion of the cost of the joint program in plaintiff's fiscal year 1974. Plaintiff claims that the joint nursing education program enhances the quality of patient care at the hospital "by providing direct patient services through the clinical portion of the program on Plaintiff's premises and by assuring continued availability of well trained nurses for employment by Plaintiff to meet its nursing needs" (par. 21 of Count I).

When Blue Cross audited plaintiff's fiscal year 1974 cost report, as noted, it reluctantly refused to allow the foregoing payment to Anderson College as allowable costs under the Social Security Act and Medicare regulations in view of a November 1975 general policy statement issued by the Secretary's Bureau of Health Insurance (Tr. 15). According to that policy statement, a provider's contributions to a nursing education program of which it is not the legal operator are not allowable costs.

Plaintiff appealed this disallowance to the Secretary's Provider Reimbursement Review Board pursuant to 42 U.S.C. § 1395 *oo*. On January 17, 1977, the Board reversed Blue Cross' disallowance and held

---

**3.** Plaintiff stated that its payments to the College were geared to the extra expense the College incurred above that for its non-nursing students because of the clinical aspects of providing nursing education. These additional expenses were due to the substantially lower stu-

dent-teacher ratio necessary for the clinical courses (Tr. 181, 214, 220, 320).

**4.** The first year's projected cost of $106,000 was reduced to $86,760 because of a contribution made to the program by another hospital (Tr. 20).

that these costs incurred by plaintiff for its participation in the joint nursing education program with Anderson College are allowable costs for Medicare reimbursement. The Board reasoned that the sentence of the above-quoted regulation recognizing that educational costs should be borne by the community did not require disallowance of these costs because Anderson, Indiana, had never assumed responsibility for financing the program. The Board considered the program did not result in a redistribution of costs from educational institutions to hospitals in violation of the last sentence of the regulation for the following reason:

> "Since the College did not operate a nursing program prior to being affiliated with the [plaintiff] Provider, the College did not have any costs to redistribute to the program. If costs were redistributed, it appears that the College absorbed costs which were previously incurred by the Provider." (Tr. 165.)

Therefore, the Board concluded that the preceding language of the regulation permitted plaintiff to recover the claimed amount.

On March 14, 1977, the Secretary's Acting Administrator for Health Care Financing Administration and the Commissioner of Social Security reversed the Board's decision on the ultimate ground that the amount in question constituted "cash payments by providers to nonprovider-operators of such training programs" and that such "costs are unnecessary in the efficient delivery of health services" (Tr. 25, 30). The signatories of this decision for the Secretary reasoned as follows:

> "Once the community assumes the cost of an approved education activity, the Medicare program will not participate in support of this activity. Therefore, in this case, the money advanced by the [plaintiff] Provider to the College in support of the nursing education program cannot be considered a reimbursable cost." (Tr. 28.) [5]

In his answer to the complaint, the Secretary admitted that there were no other nursing schools in Anderson, Indiana, and that by letter Blue Cross of Indiana had informed another participant in the joint program that nursing education expenditures paid by it and by plaintiff to Anderson College would be reimbursable by Medicare.[6] The Secretary also admitted that in fiscal 1974, plaintiff had paid Anderson College $86,760 as its agreed portion of the joint program cost. Nevertheless the Secretary sought judicial affirmance of the March 14, 1977, decision made on his behalf by the Acting Administrator for Health Care Financing Administration and the Commissioner of Social Security.

Subsequently both parties filed cross-motions for summary judgment, and on April 26, 1978, the district court granted plaintiff's motion. In its accompanying "Memorandum Entry" the court ruled that the Secretary's final decision denying plaintiff's request for reimbursement of its nursing education costs for fiscal year 1974 was erroneous and not supported by substantial evidence. The court held as follows:

> "The clear weight of the evidence can only lead to the conclusion that plaintiff is engaged in a nursing education program which is not community supported. Disallowance of plaintiff's claim for reimbursement based upon 20 C.F.R. § 405.421 would have the effect of violating 42 U.S.C. § 1395x(v)(1)(a) which prohibits shifting to non-Medicare patients the direct or indirect cost of providing services to Medicare beneficiaries." (App. 22.)

A similar dispute arose with respect to plaintiff's fiscal year 1975, ending with summary judgment for plaintiff on July 12, 1978. The Secretary's appeal from that judgment was consolidated here with his appeal from the April 26, 1978, summary judgment. We affirm both judgments.

---

5. The decision shows that it was prepared by Erica L. Gosnell, Attorney-Advisor (Tr. 31).

6. The defendant at one point challenged plaintiff's reliance on this letter, which was sent after plaintiff had signed the contract with the College. However, it appears to be undisputed that plaintiff had sought and received identical oral advice from Blue Cross prior to committing itself to the program.

*Applicable Medicare Program.*

Congress made the Medicare Program effective in July 1966 through the enactment of Title XVIII of the Social Security Act (42 U.S.C. §§ 1395–1395pp). Under the Medicare Program, eligible individual beneficiaries are entitled to have the cost of in-patient hospital care paid by the Department of Health, Education and Welfare headed by defendant Secretary (42 U.S.C. § 1395d). Participating hospitals are reimbursed by Medicare trust funds for the reasonable cost of services they provide to Medicare beneficiaries (42 U.S.C. §§ 1395f(b), 1395g). As a provider of services (42 U.S.C. § 1395x(u)), plaintiff has a provider agreement with the Secretary whereby the plaintiff agrees not to charge Medicare beneficiaries for services it furnishes to them that are covered by the Medicare Program (42 U.S.C. § 1395cc).

The statute commits the Secretary to reimburse Medicare providers from Medicare trust funds for all reasonable costs allocable to care of Medicare patients (42 U.S.C. § 1395f(b)(1)). In determining reasonable costs of services for which a hospital is entitled to be reimbursed, the Secretary must take into account both direct and indirect costs. Moreover, he may not cause costs properly allocable to caring for Medicare patients to be shifted to non-Medicare patients. (42 U.S.C. § 1395x(v)(1)(A) and 42 C.F.R. Part 405).

■ The legislative history of the Medicare Act clearly shows that the Medicare Program was intended to pay its share of a hospital's cost of educational activities contributing to patient care until such costs are borne by the community served by the hospital.[7] Consequently, the Secretary's 1966 Medicare Reimbursement Regulations provided for the reimbursement for education-al costs incurred by hospitals, including the costs of engaging in nursing education (42 C.F.R. § 405.421 quoted in pertinent part above).[8] Paragraph (a) of Section 405.421 makes the net cost of approved educational activities an allowable cost, and paragraph (b)(1) defines approved educational activity as "formally organized or planned programs of study usually engaged in by providers [such as plaintiff] in order to enhance the quality of patient care in an institution." While paragraph (c) envisages that the costs of such educational activities shall be borne by the community in the future, the Medicare Program is intended to continue to support those activities until communities undertake to bear the costs. See 42 C.F.R. § 405.421(b) and (c) *supra.*

*Since Plaintiff Engaged Therein, Its Cost of Participation in the Joint Nursing Education Program Is Reimbursable if Other Criteria of the Regulations Are Met.*

■ Under 42 C.F.R. § 405.421(c) Medicare is to pay its share of the cost of education programs "engaged in" by providers such as plaintiff. Until 1975, the Secretary did not dispute that plaintiff was engaged in nursing education, so that the costs thereof were reimbursable under the Medicare Program. However, in January 1976, Blue Cross unwillingly denied plaintiff reimbursement of its claimed nursing education costs on the ground that plaintiff was not the "legal operator" of the joint nursing program with Anderson College in plaintiff's fiscal year ending May 31, 1974.[9] This legal operator defense was based on a November 1975 policy statement of defendant's Bureau of Health Insurance. While Blue Cross believed this policy statement to be erroneous, it concluded that it was

---

7. See S.Rep.No.404, Part I, 89th Cong., 1st Sess. 36 (1965); see also H.Rep.No.213, 89th Cong., 1st Sess. 32 (1965); 1 U.S.Code Cong. & Admin.News 1965, p. 1943.

8. Subsequent amendments to this Section of the Regulations are irrelevant to this case.

9. Although plaintiff was also not the legal operator of the Holy Cross School of Nursing, coun-sel for the Secretary explained at oral argument that the intention was to deny reimbursement only when a non-provider was the legal operator. Since St. Joseph Hospital, another Medicare provider, was the legal operator of the Holy Cross program, plaintiff's contributions to it were deemed reimbursable.

nevertheless bound by it (Tr. 15).[10] However, the Provider Reimbursement Review Board held that 42 C.F.R. § 405.421(c) does not require the provider to be the legal operator of the nursing program but instead only requires the provider to "engage in" such activity, stating

"The Board finds that this requirement has been met through a contractual agreement between the Provider and the College. In the instant case, the success of the program was dependent on the Provider's participation. The National League for Nursing would not sanction any program unless clinical training was provided. The Provider has demonstrated that it is an active participant in the joint program. The Director of Nursing Services at the Hospital shares the responsibility for the nursing program with the Director of Nursing at the College. Thus, contrary to the [Blue Cross] Intermediary's argument, the Provider did participate in the control of the activities of the nursing program. Therefore, the Board finds the Provider and the College are jointly the operators of the nursing program in question for participation of one is dependent upon the other's participation." (Tr. 165.)

■ This finding was supported by substantial evidence which shows that the clinical portion of the nursing program includes classroom instruction and on-the-job training taking place on the premises of plaintiff as it formerly did under the Holy Cross program. Not only did plaintiff originate the joint nursing education program, but it played a major role in developing the curriculum therefor and its staff actively participates in the clinical portion of the program conducted on its premises (Tr. 218, 223). Plaintiff's cash payments are calculated to reimburse the College for the extra clinical instructors it must hire to carry on the nursing program (see note 3, *supra*). Plaintiff cannot pay these instructors directly, since the National League for Nursing requires as a condition of accrediting the program that the instructors be employed by the College (Tr. 242, 249). However, these instructors spend much of their time on the premises of plaintiff and are subject to its rules and practices.[11] Plaintiff is equally represented with the College on the Curriculum Committee of the program and has a strong voice in the selection of the faculty, including the clinical instructors (Tr. 222). Plaintiff is obligated by contract to participate clinically and financially in the program, and administrators of both institutions periodically discuss the operation of the program and resolve any differences with respect to its conduct. Therefore, the Board was justified in finding that plaintiff and Anderson College are joint operators of the nursing program, each dependent upon the other. Consequently, plaintiff's payments to Anderson College for needed faculty in the jointly operated nursing program are allowable costs for Medicare reimbursement if the other criteria of 42 C.F.R. § 405.421(c) have been met.

*The Remaining Criteria for Education Costs to be Reimbursable Are Satisfied.*

■ In its decision, the Provider Reimbursement Review Board noted that under 42 C.F.R. § 405.421(c), in order for educational costs to be reimbursable under the Medicare Program:

"a. The education program must be approved.

10. The pertinent part of this policy statement appeared in a revision to the defendant's Provider Reimbursement Manual which is a policy guide not published in the Federal Register and not part of defendant's Regulations. In pertinent part, the statement provided:

"Where a provider furnishes financial or other support (e. g., donated classroom or clinical space) to an approved nursing or paramedical education program of which it is not *the legal operator,* expenses attributable to the provider's support of the program are considered to be a contribution to a community effort, and may not be included in the hospital's allowable costs for Medicare reimbursement purposes" (emphasis supplied).

11. The hospital administrator indicated that the hospital had an effective means of securing the discharge of unacceptable clinical instructors since it can simply refuse them access to the hospital and its facilities (Tr. 242).

"b. The program must contribute to the quality of patient care within an institution.

"c. Until communities undertake to bear these costs, the program will participate appropriately in the support of these activities.

"d. It is not intended that the program should participate in increased costs resulting from redistribution of costs from educational institutions to patient care institutions." (Tr. 163.)

As the Board held, these four criteria were satisfied by plaintiff's proof. First of all, this nursing program received the approval of the National League for Nursing. Second, it contributed greatly to the quality of patient care because plaintiff's high nursing turnover rate and dearth of nurses were minimized as a result of this program. Also, each student nurse in the joint program cares for a smaller number of patients and spends more time with them than do graduate nurses, thus supplementing the regular nursing staff and resulting in better patient satisfaction. Third, the Anderson, Indiana, community was presently unwilling to finance the nursing program, making it necessary to receive the financial support of the Medicare Program within the meaning of Section 405.421(c) of the Regulations.[12] The fourth criteria was also satisfied because the Board found:

"Since the College did not operate a nursing program prior to being affiliated with the Provider, the College did not have any costs to redistribute to the program. If costs were redistributed, it appears that the College absorbed costs which were previously incurred by the Provider". (Tr. 165.)

*Plaintiff's Nursing Education Expenses Are Reasonable and Necessary.*

■ The Medicare Act defines reasonable costs as costs actually incurred if they are "necessary in the efficient delivery of needed health services" to covered individuals (42 U.S.C. § 1395x(v)(1)(A)), and the Medi-

care Regulations define necessary and proper costs as follows:

"Necessary and proper costs are costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs which are common and accepted occurrences in the field of the provider's activity." (42 C.F.R. § 405.451(b)(2).)

One of the reasons advanced by the Acting Administrator for Health Care Financing Administration and the Commissioner of Social Security in denying plaintiff Medicare reimbursement was that the disputed costs were unnecessary in the efficient delivery of health services (Tr. 30). However, the record shows that the plaintiff's nursing program is necessary to enable it to meet its staffing needs and that the joint program with Anderson College was the most economical and efficient way to meet those needs. The program has benefitted patient care at the hospital and has provided an adequate source of well-qualified registered nurses while reducing turnover and educational and recruiting costs. The two-year program between plaintiff and Anderson College results in an associate degree in nursing. The program requires close cooperation between plaintiff and the College and gives plaintiff more control over the nursing program than it had under the Holy Cross program. Under the new program, the average nursing education cost to plaintiff for each hired nursing graduate is $4800 compared to $28,500 with respect to nursing graduates hired under the Holy Cross program. Under the definition of necessary and proper costs contained in the Regulations, the expenditures in question were clearly necessary in the efficient delivery of health services. Indeed, the decision reversing the Provider Reimbursement Review Board acknowledged that the joint program's student nurses supplement patient care and provide a source of new

---

12. It is undisputed that Anderson College would not have undertaken the program without the clinical and financial support of the hospital.

professionals for plaintiff and others to the advantage of the hospital and its patients. As the decision acknowledged, the program enables plaintiff to fill nursing vacancies, reduce employee turnover and lower recruiting expenses. (Tr. 26, 27–28.)

Additionally, plaintiff's participation in the very similar Holy Cross program was previously held necessary and reimbursable. Plaintiff was affiliated with the Holy Cross School of Nursing from 1950 through 1973, and from 1966 on plaintiff was reimbursed under the Medicare Program for payments to the Holy Cross program. These payments were made to St. Joseph's Hospital in South Bend, Indiana, and payments were made by it in turn to St. Mary's College, Notre Dame, Indiana, for academic nursing training received at the college by first-year students in plaintiff's nursing education program. Such payments by plaintiff were akin to those it made to Anderson College and call for like treatment by the Secretary.

Since the Secretary has conceded that plaintiff's Holy Cross program was clearly reimbursable (Br. 13) and thus a reasonable and necessary cost, it is apparent that the present, less expensive and more productive program, which continues to enhance patient care, requires the costs of the joint program to be deemed reasonable and necessary, as the district court held.

The Secretary's conclusion that the program costs were unnecessary appears to be based solely on the theory that once a nonprovider becomes the legal operator of the program, this establishes that the community has undertaken the costs of nursing education, so that it is unnecessary for the provider to continue to bear them (Tr. 27). This theory is plainly contrary to the facts of the present case (see note 12 *supra*).

While the defendant has urged that the district court rewrote the Medicare statute and permitted reimbursement for unnecessary costs, the feared abuses are not possible because the Provider Reimbursement Review Board permits the cost of nursing education to be allowable only in two of the following four situations:

"1. In those situations where agreements to conduct joint educational programs in conjunction with educational institutions were entered into at least one year prior to the inception of the Medicare program and payments began at the same time the Provider started participating in the educational program, *or*

"2. In those situations where a Provider agreed to participate in such programs and payments began at the same time that the educational institution started the nursing program, *or*

"3. In those situations where a Provider started to make payments to an existing program already partially supported by other Providers, the total amount of payments to that program by all the participating Providers was kept at the same level and the payment of other Providers is reduced.

"[4.] In addition to meeting any one of the above 3 requirements, the Providers must demonstrate that the basis of the payments to the educational institutions by the Providers has not been increased. Any increased payments resulting from an increase in the basis of payment would not be allowable." (Tr. 133; emphasis supplied.)

The second of the above conditions is of course met by the plaintiff's joint program with Anderson College, and in accordance with the fourth above-quoted requirement, plaintiff has shown that the payments for its nursing program have been decreased from $130,000 to $86,760 in fiscal year 1974, of which plaintiff is claiming only $27,760 in Medicare reimbursement. Therefore the decision reversing the Provider Reimbursement Review Board may not stand.

Similarly, the limitations imposed by the Provider Reimbursement Review Board as-

sure that a provider cannot simply choose to make gratuitous contributions to medical or nursing schools in the expectation of reimbursement from Medicare funds.[13] These limitations also provide a means by which the Secretary can maintain control of the amounts expended for programs operated by non-providers.[14]

*Disallowance of the Reimbursement Would Shift the Cost of Providing Services to Non-Medicare Beneficiaries.*

Both Medicare beneficiaries and non-Medicare patients are served by this joint nursing program. As Judge Noland held, disallowance of plaintiff's claim for reimbursement would violate 42 U.S.C. § 1395x(v)(1)(A) which prohibits shifting to non-Medicare patients the necessary direct or indirect costs of providing services to Medicare beneficiaries. Plaintiff is seeking only $27,760 in Medicare reimbursement out of a total cost of $86,760 because only 32% of plaintiff's services were provided to Medicare beneficiaries. Unless the claimed reimbursement is allowed, the burden will fall on the non-Medicare patients even though, as seen, these are "necessary costs of efficiently delivering covered services" and under the foregoing Section should be borne by Medicare beneficiaries to the extent they are served.

*It Is Not Appropriate for the Courts to Accord the Secretary's Position Extreme Deference in This Case.*

The defendant has insisted that an agency's interpretation of a statute it is directed to administer is entitled to great deference. Hence the defendant asserts implementing regulations should be set aside only if they are clearly contrary to the statutory scheme, and an agency's interpretation of its own regulations should be set aside only if that interpretation is unreasonable.[15] However, a review of the cases reveals that the degree of deference to be accorded agency action varies with the circumstances, and a careful consideration of the Medicare statute and the manner in which it has been administered reveals that such deference would be particularly inappropriate in this case where we are not setting aside any regulation but only disagreeing with an unofficial interpretation of it.

The cases cited by defendant to bolster his position arose in contexts significantly different from the present one. In *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616, the plaintiff challenged the grant of an oil and gas lease to a competing applicant on the ground that the Secretary of the Interior had interpreted certain executive orders erroneously. The Supreme Court justified its decision in favor of the Secretary on the basis that his interpretation was long-standing, public, and had engendered reasonable reliance.[16] None of those fac-

**13.** This specter, raised in the opinion reversing the Board (Tr. 26), appeared somewhat unreal as an initial matter because only a fraction of such costs could even in theory be recovered as allocable to Medicare patients. The stringent limitations imposed by the Provider Reimbursement Review Board simply lay this fear to rest.

**14.** For example, the jointly administered program acted in conformity with the third limitation imposed by the Board when, upon receipt of support from another provider, the program reduced plaintiff's obligation (see note 4, *supra* ).

**15.** The defendant's syllogism concludes that since it is not unreasonable to interpret the term "engaged in" nursing education to mean being the legal operator of a nursing education program, the Bureau of Health Insurance's interpretation of the regulation is invulnerable. While such an interpretation may be "reasonable" in the abstract, it is unreasonable con-

sidered in light of the legislative history, the evolution of nursing education and the prior administrative treatment of nursing education expenses. As developed more fully in the text, the Secretary's position here is not entitled to the degree of deference he seeks. The district court properly set aside his decision as erroneous.

**16.** The Court stated:

"Since their promulgation, the Secretary has consistently construed both [executive] orders not to bar oil and gas leases; moreover, this interpretation has been made a repeated matter of public record. While the [challenged] Griffin leases * * * have been developed in reliance on the Secretary's interpretation, [plaintiffs] do not claim to have relied to their detriment upon a contrary construction." 380 U.S. at 4, 85 S.Ct. at 795.

tors is present here. The interpretation at issue in this case apparently was informally formulated in 1972 (see discussion *infra*) in response to a growing trend for hospitals to operate joint programs with colleges. It was never publicized in any form until November 1975, well after plaintiff had committed itself in reasonable reliance on the regulation, which remains unamended in this respect, and its prior administration. Another case relied on by defendant, *Red Lion Broadcasting Co., Inc. v. Federal Communications Commission,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371, provides an even clearer example of the kinds of circumstances in which the argued-for deference is appropriate. At issue was the FCC's adoption of regulations embodying the fairness doctrine. The Supreme Court concluded that given 30 years of consistent administrative interpretation, coupled with a statutory amendment ratifying that interpretation, it could be presumed to be correct. Clearly that doctrine has no relevance to the present case.

The recent case of *Batterton v. Francis,* 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448, is also distinguishable. In *Batterton,* a new Department of Health, Education and Welfare regulation under the Aid to Families with Dependent Children—Unemployed Fathers program allowed participating states to define "unemployment" to exclude families of striking workers from benefits. This regulation was attacked as contrary to the statute. The Supreme Court upheld the regulation, apparently concluding that the Secretary's definition was reasonably related to the purpose of the statute (432 U.S. at 428, 97 S.Ct. 2399), and noting that because the statute expressly delegated to the Secretary the power to define "unemployment" and because the primary responsibility for interpreting the term was entrusted to him rather than to the courts, his definition should be respected. None of these reasons for according deference is present in this case. As already described, it is not at all clear that the regulation as interpreted by the Bureau of Health Insurance is reasonably related to the purpose of the statute. The regulation has not been changed to incorporate its policy statement. Moreover, although the Secretary emphasizes that the Medicare statute delegates to him the task of defining "reasonable cost," in fact his authority to do so is significantly more circumscribed than was the authority delegated in *Batterton.*[17] Finally, the statute specifically creates the right to judicial review of the Secretary's adverse ruling on what costs are reimbursable, thus reserving to the courts the final authority to interpret this aspect of the statute (42 U.S.C. § 1395 *oo* (f)).[18]

It is thus apparent that the circumstances justifying an especially high degree of deference to administrative decisions are not present here. Further, in cases more closely analogous to the present one, the Supreme Court has not hesitated to overturn an agency regulation or interpretation when convinced it was wrong. *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d

**17.** As the *Batterton* Court noted, the only limits on the Secretary's authority to define "unemployment" were the inherent ones that the definition must bear some relationship to some recognized concept of unemployment and that it must not defeat the purpose of the program. 432 U.S. at 428, 97 S.Ct. 2399. Here, in contrast, the statute commits the agency to pay providers the cost actually incurred, excluding only the unnecessary costs. 42 U.S.C. § 1395f(b)(1) and § 1395x(v)(1)(A). Reasonable costs "shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included * * *" (42 U.S.C. § 1395x(v)(1)(A)). As previously noted, such regulations must also take into account both direct and indirect costs and must avoid the result of shifting costs to non-Medicare patients.

**18.** This special provision for judicial review is not surprising in light of the statutory scheme. Here the plaintiff is not the beneficiary of the government program, but a necessary participant in carrying out the program. The Secretary is obligated by statute to reimburse all reasonable costs of such providers. It would be inappropriate to allow his subordinates to be the final arbiter of what is reasonable, particularly when they have overruled the decision of the Provider Reimbursement Review Board which was set up to mediate disputes between providers and intermediaries acting for the agency.

270; *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission,* 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090; *Social Security Board v. Nierotko,* 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718.

■ Procedural inadequacies surrounding the administrative decision deprive it of any presumption of correctness to which it otherwise might be entitled. It is undisputed that the ground for the intermediary Blue Cross' disallowance of the nursing education expenses was the November 1975 policy statement adopted by the Bureau of Health Insurance that such expenses were reimbursable only if the provider was the legal operator of the program. However, the Administrative Procedure Act, 5 U.S.C. § 552(a)(1)(D), requires agencies to publish "statements of general policy or interpretations of general applicability" in the Federal Register. If such a policy or interpretation is not so published, a person without actual notice of it "may not in any manner * * * be adversely affected" by it (5 U.S.C. § 552(a)(1)(E)).[19] The policy or interpretation at issue here has never been properly published. The plaintiff had no notice of it until it was denied reimbursement in 1976, and the policy was not disseminated even to intermediaries such as Blue Cross until November 1975, about two and a half years after plaintiff had made its commitment to the College.

The defendant now appears to rely less on this unpublished internal policy than on the Secretary's authority to interpret the regulation through his delegates' review of the Board's ruling. The policy statement, which does not have the force of law, is indeed a weak reed. But it is also apparent that the decision of the Secretary's delegates on this issue was strongly influenced by the previously adopted policy. To the extent this is true, the decision is entitled to no more deference than the policy being applied therein.

In deciding plaintiff's case, the Secretary's delegates relied on two earlier cases raising similar issues in which they had also overruled the Provider Reimbursement Review Board.[20] While an agency can in appropriate circumstances develop a policy through an adjudicatory proceeding and can, again in appropriate circumstances, apply properly developed policy retroactively, the circumstances here were not appropriate for the application of these doctrines. In addition, the record reflects that the position taken here was unduly influenced by the previously adopted but unpublished policy.

The agency was well aware of the need for policy direction on this issue. It has offered no justification for not publicizing the policy its Bureau of Health Insurance evidently developed as early as 1972. Moreover, it must have been aware that providers would make business decisions in reliance on the interpretation of the regulations by the intermediaries, who are statutorily authorized to render such advice (42 U.S.C. § 1395h(a)(1)). The failure to inform the intermediaries of the new policy so that they could render correct advice and to publish the policy for the benefit of the providers is inexcusable.

Finally, an examination of the Secretary's subordinates' first decision on the joint provider-college nursing program, relied on in this case, suggests that it was largely a reflection of the policy previously adopted by the Bureau of Health Insurance. Although the opinion (No. 76–D22, Tr. 131) reviews the legislative history to bolster its reasoning, the conclusions it draws are singularly unconvincing. Moreover, the opinion incorporated the advice of the Bureau of Health Insurance, which advocated overturning the Provider Reimbursement Re-

---

**19.** The Supreme Court relied in part on noncompliance with this Section in reversing an agency's interpretation of its own regulation in *Morton v. Ruiz,* 415 U.S. 199, 231–233, 235–236, 94 S.Ct. 1055, 39 L.Ed.2d 270. There, as here, the policy was merely published in an internal agency manual.

**20.** There was a third case prior to plaintiff's on the same issue with the same result. The opinions reversing the Board in all four cases were substantially verbatim.

view Board's decision as "not an interpretation of existing program policy" (Tr. 135). In addition, the opinion quoted a regulation which provides that the Board "shall afford great weight to interpretive rules, general statements of policy, and rules of agency organization, procedure or practice established by the Bureau of Health Insurance" (Tr. 139). Similarly, the opinion concluded "[i]t is and has been the position of the Medicare program that community assumption of responsibility * * * [is] established when a nonprovider organization * * * assumes legal operatorship of a program" (Tr. 146). Again, the opinion held that "the Board * * * is not authorized to set aside existing program policies and substitute for them ad hoc policies of its own design" (Tr. 148). Thus the Secretary was not developing policy through an adjudicatory proceeding but was endorsing the previously adopted but unpublished internal policy of the Bureau of Health Insurance.

Requiring agency policy such as that involved here to be either publicized promptly or originated in an adjudicatory setting serves several salutary purposes. First, affected parties will be put on notice of the agency's intended course. Second, and more important, either of those procedures assures that some party with a stake in the policy will be enabled to present its views to the agency before the policy becomes entrenched by repeated application. In contrast, when the first opinion for the Secretary confronted the present issue, the Bureau of Health Insurance had been rendering advice on the basis of its unpublicized policy for some four years. The inertia of this administrative practice appears effectively to have deprived intermediaries and providers of any real opportunity to demonstrate the inappropriateness of the policy, which was developed without any shown input from any providers or intermediaries. Under all of these circumstances, the deci-

sion of the Secretary's delegates does not deserve the deference sought.

*Estoppel*

Plaintiff has strenuously argued that since Blue Cross of Indiana approved this program as defendant's agent, the costs of the program must be reimbursed from Medicare trust funds. Blue Cross changed its position only because contrary to the Regulations, the Bureau of Health Insurance in November 1975 took the position (with which Blue Cross disagreed) that the provider must be the "legal operator" of the nursing program. Plaintiff embarked on the joint nursing program in reliance on Blue Cross' determination that the payments to Anderson College would be reimbursable, so that plaintiff's estoppel argument is appealing. However, we need not decide whether estoppel should be enforced against the Secretary in the present case, for plaintiff has already shown that the district court's decision was correct for other reasons.

The decision of the Provider Reimbursement Review Board for plaintiff's fiscal years ending May 31, 1974 and 1975 were in accord with the Medicare Act, the regulations and the evidence. For the reasons given herein, the contrary decisions of the Acting Administrator for Health Care Financing Administration and the Commissioner of Social Security were erroneous.[21] Therefore the judgments of the district court are affirmed.

21. As to plaintiff's fiscal year 1975, the Board and the Administrator of the Health Care Financing Administration merely followed their prior decisions (R. 15–27 in our No. 78–2203).