**LOS ALAMITOS GENERAL HOSPITAL, INC., a corporation, dba Los Alamitos General Hospital, Plaintiff,**

v.

**Thomas DONNELLY, Acting Secretary of Health and Human Services, Defendant.**

No. CA 79–0668.

United States District Court, District of Columbia.

Feb. 28, 1983.

Patric Hooper, Bruce R. Gilbert, Los Angeles, Cal., for plaintiff.

Asst. U.S. Atty. Valerie K. Schurman, Washington, D.C., for defendant.

MEMORANDUM OPINION

JOHN GARRETT PENN, District Judge.

Plaintiff, Los Alamitos General Hospital, is a certified provider of services under Title XVIII of the Social Security Act ("Medicare Act"), 42 U.S.C. § 1395 *et seq.* To participate in the Medicare program a provider must enter into an agreement with the Secretary of Health and Human Services[1] (Secretary) whereby the Secretary agrees to reimburse the provider for the reasonable costs of providing services to Medicare patients and the provider agrees not to charge the patients directly.

In 1973 Los Alamitos opened a five-bed postcoronary care unit (PCU) which it alleges was established to reduce the high incidence of sudden death among patients with serious heart conditions. Plaintiff filed cost reports with its fiscal intermediary,[2] Blue Cross of Southern California, for the fiscal years ending on November 30, 1973, April 30, 1974, April 30, 1975 and April 30, 1976, in which it treated its PCU as a special care unit pursuant to 42 C.F.R. § 405.452(d)(10). Accordingly, it calculated its reasonable costs in the PCU based solely on the ratio of Medicare beneficiary charges to total patient charges within that department. 42 C.F.R. § 405.452(a).

In 1969 Los Alamitos entered into an agreement with the Vocational Nursing School of Southern California to operate a nursing school on the hospital's premises. The overall responsibility for running the school was assumed by the hospital and both classroom instruction and clinical training occurred there. The nursing school was operated at the hospital until 1976. Los Alamitos claimed the costs associated with the nursing school as part of its reasonable costs pursuant to 42 C.F.R. § 405.-421.

The fiscal intermediary determined that the PCU did not qualify as a special care unit for purposes of Medicare reimbursement, and also disallowed all of the hospital's nursing school costs. After consulting with the Medicare Bureau, however, the intermediary modified its finding as it related to the nursing school to allow that portion of the instructor's salary attributable to supervision of clinical training.

Los Alamitos requested a hearing before the Provider Reimbursement Review Board ("Board"), which was held on June 13, 1978. *See* 42 C.F.R. § 405.1835. On October 27, 1978 the Board issued a decision reversing the intermediary's finding and specifically holding that the PCU qualified as a special care unit and that the nursing school costs were allowable.

On November 9, 1978 the Secretary, through the Health Care Financing Administration elected to review the Board's decision. 42 U.S.C. § 1395*oo* (f). Shortly thereafter, on January 2, 1979, the Secretary issued an order reversing the Board's decision and reinstating the adjustments made by the intermediary.

Plaintiff filed this action on March 1, 1979, pursuant to 42 U.S.C. § 1395*oo* (f). *See also* 42 C.F.R. § 405.1877. The case is presently before the Court on defendant's motion to affirm the Secretary's decision and plaintiff's cross-motion for summary judgment.

Judicial review of the Secretary's determination is limited by 5 U.S.C. § 706. The Secretary's decision must be upheld unless upon reviewing the administrative record ("Rec.") it is found to be unsupported by substantial evidence, arbitrary, capricious, or otherwise not in accordance with law.

I. *The Nursing School.*

The Vocational Nursing School of Southern California is a wholly owned subsidiary

---

1. This case was originally filed against Joseph A. Califano, Secretary of Health, Education and Welfare. Thomas Donnelly, Acting Secretary of Health and Human Services has been automatically substituted as the defendant. Fed.R. Civ.P. 25(d)(1).

2. The fiscal intermediary acts as the agent of the Secretary. It reviews and audits annual reports filed by providers, and then determines the amount of reimbursement due under the Medicare program. 42 U.S.C. § 1395h.

of American Medicorp, and other than the agreement regarding operation of the nursing school on the hospital's premises it had no affiliation with Los Alamitos. Under the terms of the agreement a teacher acceptable to both parties would be secured by the Vocational Nursing School and employed by Los Alamitos, the hospital would pay four dollars per day for each of the fifteen students to the Vocational Nursing School to be applied against the students' contractual obligations, and the students would receive four hours of classroom instruction and four hours of clinical training each day on the hospital's premises. *See* Rec. 140–144, 315–316; Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Judgment Affirming His Decision and in Support of Plaintiff's Motion for Summary Judgment ("Plaintiff's Memorandum") at 41; Defendant's Memorandum in Support of His Motion to Affirm His Decision at 7. The parties agree that the hospital was responsible for the operation of the nursing school. *Id.;* Rec. 80–81. In addition, the hospital furnished all teaching supplies, utilities, and other services necessary for the school's operation. Rec. 80.

According to the affidavit of Earl Feiwell, Chairman of the Board of Directors of Los Alamitos, the hospital agreed to operate the nursing school on its premises due to the great need for nurses in the community and at Los Alamitos in particular, the shortage of trained nurses and the lack of programs for training nurses in the community, the belief that the school would remedy this shortage of qualified nurses at the hospital and elsewhere, and the belief that the school would enhance the quality of nursing care at Los Alamitos. Rec. 333–334. Moreover, without the agreement between Los Alamitos and the Vocational Nursing School the hospital may have been required to operate its own school at greater expense. *Id.* These reasons are consistent with the prescription in 42 C.F.R. § 405.421.

The nursing school was approved by the State Board of Vocational Nurses and Psychiatric Technician Examiners, Department of Consumer Affairs, the organization vested with authority to approve the program. *See* 42 C.F.R. § 405.421(e); Rec. 81. It was also sanctioned by the Joint Commission on Accreditation of Hospitals. Rec. 81.

■ The Secretary found that Los Alamitos was not "engage[d] in educational activities" as that term is defined by the regulation and legislative history because the nursing program was not exclusively provider-based. Rather, the funding contributed by the hospital was tantamount to contributions to an educational program operated by someone other than the provider, which are not reimbursable. *See* 42 C.F.R. § 405.421(c); Rec. 17–19. The Secretary also held that the "costs claimed as educational costs constitute costs unnecessary in the efficient delivery of health services . . . ." *Id.* at 26.

In reaching his decision the Secretary expressly relied on § 404.2 of the Provider Reimbursement Manual, issued by the Medicare Bureau, which requires a provider to be the "legal operator" of an educational program to receive reimbursement. Rec. 11, 21. While § 404.2 was promulgated in November 1975 the Secretary held that it could be applied retroactively since it simply clarified the regulation and did not amount to a substantive policy change. *Id.* at 21.

*St. John's Hickey Memorial Hospital v. Califano,* 599 F.2d 803 (7th Cir.1979), is, in all respects, virtually identical to the issue presented here, and this Court follows the reasoning of the Seventh Circuit in that case. *See also Community Hospital of Indianapolis, Inc. v. Califano,* [1979–2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 29,999 (S.D.Ind. Aug. 21, 1979).

First, the November 1975 amendment to § 404.2 of the Provider Reimbursement Manual cannot be viewed as merely a clarification of the regulations. *See St. John's,* 599 F.2d at 812 n. 15. In *St. John's* the fiscal intermediary initially informed the hospital that its payments to a nursing program at a local college would be reimbursable. Then, in fiscal year 1974 it held those

costs not allowable due to the constraints introduced by the November 1975 policy statement. *Id.* at 805–806. Likewise, in this case Los Alamitos initiated its program under § 404.2 as it was written prior to November 1975, which allowed these costs. Moreover, the hospital asserts that it would have started a nursing school of its own had it known that the costs would not be allowed. Rec. 162, 334–335.

Since the November 1975 policy change was not published in the Federal Register it may not be applied adversely to Los Alamitos during any period the hospital did not have actual notice of the change. *St. John's,* 599 F.2d at 814. This controversy involves the hospital's fiscal years ending on November 30, 1973, April 30, 1974, April 30, 1975 and April 30, 1976. Thus, the last year in dispute began on May 1, 1975, six months before the amendment to § 404.2 was promulgated. The Court, therefore finds that for the years in question Los Alamitos had no actual notice of § 404.2 and it may not be applied to the facts of this case.

■ Second, the Secretary's finding that the costs incurred were "unnecessary in the efficient delivery of health services" seems to be predicated solely on the theory that when a non-provider becomes the "legal operator" of an educational program it is an indication that the community has assumed responsibility for the program and the costs must be categorized as nonallowable contributions to an educational institution under 42 C.F.R. § 405.421(c). Rec. 19. The facts here plainly contradict this theory and the Secretary's finding is thus unsupported by substantial evidence and not in accordance with law. *Accord, St. John's,* 599 F.2d at 811.

■ Finally, the Court finds that since nursing services are provided to both Medicare and nonMedicare patients disallowance of the costs of the nursing program would violate 42 U.S.C. § 1395x(v)(1)(A), which provides that the costs of services delivered to beneficiaries of the Medicare Act should not be borne by nonbeneficiaries. *Accord, St. John's,* 599 F.2d at 812.

For the reasons stated above the Court concludes that the decision of the Provider Reimbursement Review Board was consistent with the evidence and law, and the decision of the Secretary was erroneous.

## II. *The Postcoronary Care Unit.*

According to the findings of the Board, which were incorporated by the Secretary, the PCU is located near the 17-bed intensive care-coronary care unit (ICU–CCU). Since the PCU is considered a special care unit by the hospital it is under the direction of the Intensive and Coronary Care Department and is directly supervised by the committee which is responsible for coordination of the critical care unit. An ICU–CCU qualified registered nurse is in charge of the PCU on each shift and reports directly to the ICU–CCU supervisor. In addition, administrative policies for both the ICU–CCU and the PCU are formulated by the critical care committee chairman. The committee chairman is also responsible for resolving policy, procedure and comprehensive care issues when they arise in the special care units. Rec. 81–82.

The Secretary made the following additional findings:

The majority of patients admitted to the PCU are transferred from the CCU (Provider's Position Paper, p. 42). The five-bed PCU is equipped with softwire telemetry units which serve as cardiac monitors, and with defibrillators, ventilation therapy equipment, and oxygen (Tr. 93, 96). The PCU is staffed by registered nurses and licensed vocational nurses who are specially trained in critical care nursing (Provider's Position Paper, pp. 44–47). A study of the five-month period ending April 30, 1974 reveals that the salary costs per diem were $33.86 in the PCU, $73.00 in the ICU–CCU and $29.01 in the routine care areas. The hours per patient day were 5.6 in the PCU and routine areas, and 13.4 in the ICU–CCU. In the fiscal year ending April 30, 1975, the salary costs per diem were $35.21 in the PCU, $80.10 in the ICU–CCU and $28.99 in the routine areas. The hours per patient day

were 5.8 in the PCU, 5.6 in the routine areas, and 14.0 in the ICU–CCU (Intermediary's Position Paper, p. 8). The Provider's expert witness testified that under California law, the PCU could not qualify as an ICU because of the patient to staff ratio (Transcript of Oral Hearing, p. 116, hereinafter referred to as Tr.). The witness testified that in routine care areas, 4.2 to 4.5 hours of direct nursing care are delivered to each patient in every 24-hour period; in the PCU the patients receive 5.6 to 6.8 hours of care. Patients in the ICU receive 12 hours of direct care daily (Tr. 116–118).

Rec. 6.

The parties do not dispute the general principles of the Medicare Act to fairly apportion costs between Medicare beneficiaries and other patients, and to reimburse providers for the reasonable costs incurred in providing services to Medicare patients. Rather, the controversy herein concerns whether, in determining its reasonable costs, plaintiff's PCU should be classified as a "Special Care Unit" within the meaning of 42 C.F.R. § 405.452(d)(10) as it appeared during the years in question.[3]

■ For the first five years of the Medicare program the Secretary recognized only one class of care for reimbursement purposes. Since the Medicare Act does not require the Secretary to distinguish between differing levels of care, the regulation providing special rules of reimbursement for "Special Care Units" was the result of the Secretary's judgment that recognizing two classes of care would further the goals of the Medicare Act, and the initial decision where to draw the line between the two was consequently for the Secretary alone. *See Psychiatric Institute of Washington, D.C., Inc. v. Schweiker,* 216 U.S. App.D.C. 14, 669 F.2d 812, 813 (1981), *rev'g Psychiatric Institute of Washington, D.C., Inc. v. Harris,* 501 F.Supp. 314 (D.D.C.1980).

In *Psychiatric Institute* the Secretary compared plaintiff's Gerontological Treatment Center to intensive care units and found the care provided in the former to be less concentrated and continuous. Plaintiff argued that the Center should have been compared to routine areas and designated as a "Special Care Unit" since its level of care would be found to be more concentrated and continuous. The court concluded that while plaintiff's interpretation was reasonable the court was not "entitled to hold that the Secretary's equally tenable interpretation was contrary to law." 669 F.2d at 814 (footnotes omitted).

■ The only issue left before the Court therefore is whether the Secretary's decision that the PCU renders care at a level below an intensive care type unit was supported by substantial evidence. In reaching his decision that the PCU is not equivalent to an intensive care unit the Secretary relied primarily on statistics and testimony provided by the hospital's witnesses. First, the Secretary concluded that the PCU was designed to treat patients who have improved to the point where they do not need intensive care. This finding was based on a comparison of nursing hours per patient day which reflects the nurse/patient ratio in the various units. Second, the hospital's witness admitted that a fair characterization of the service provided by the PCU was "the delivery of nursing care to patients less acutely ill than those requiring admission to a Coronary Care Unit, but more acutely ill than those requiring admission to a general medical/surgical unit .... [It is] staffed with specialized trained nursing personnel and contained [sic] monitoring and observation equipment for intensified, comprehensive observation and care." Rec. 24, 241.

---

**3.** In 1980 the regulations were amended to substitute the term "intensive care type unit" for "special care unit." *See* 45 Fed.Reg. 54760 (1980). Also, in 1977 the Provider Reimbursement Manual was amended by the addition of § 2202.7 which changed the requirements for special care units. *See Psychiatric Institute of*

*Washington, D.C., Inc. v. Harris,* 501 F.Supp. at 316. These modifications are not applicable to the years in question in this case and the Court will only consider the statute, regulations and Manual provisions as they appeared during the years in question.

Plaintiff points out that if the PCU did not exist then patients who are currently moved to that unit would have to remain in the ICU–CCU because their conditions would be too severe for routine care. Rec. 205–206, 221–222, 337; Plaintiff's Memorandum at 12. This would increase the cost of services rendered to these patients since the ICU–CCU is more expensive than the PCU. *Id.* Thus, while the PCU may not have as stringent admission requirements it is conceivable that its discharge requirements are similar to those of the ICU–CCU.

Notwithstanding the fact the nurse/patient ratio may not be as high in the PCU, and the patients treated there may not be as acutely ill as those in the ICU–CCU, the evidence supports a finding that the PCU provides extraordinary, concentrated and continuous care to the same extent as a typical intensive care unit, and as required by the regulations. 42 C.F.R. § 405.452(d)(10). The ICU–CCU and the PCU both utilize the same highly-trained staff and administration, they are both separate from the routine area, and they are both equipped with sophisticated monitoring and diagnostic instruments.

Moreover, this conclusion is consistent with the statutory mandate that nonMedicare patients must not shoulder the costs of services provided to Medicare beneficiaries. 42 U.S.C. § 1395x(v)(1)(A). See Plaintiff's Memorandum at 37 n. 21; Rec. 257–258, 272, 511–514.

Thus, the Court finds that the Secretary's decision, based primarily on a comparison of nursing hours and a general description of the PCU provided by counsel for the defendant, was not supported by substantial evidence. Rather, as the Board found, in view of the services provided, the equipment used, the training of the personnel, the supervision and administration, and the fact many patients would remain in ICU–CCU rather than being transferred to a routine area without the PCU alternative, plaintiff's PCU must be considered a special care unit. *See* Rec. 96.

An appropriate Order shall issue.

**ORDER**

In view of the Opinion entered in the above-captioned case on February 28, 1983, it is hereby

ORDERED that defendant's motion to affirm the Secretary's decision is denied, and it is further

ORDERED that plaintiff's motion for summary judgment is granted, and it is further

ORDERED that this case is remanded to the Secretary of Health and Human Services to enter an Order reinstating the decision of the Provider Reimbursement Review Board.