**LEXINGTON COUNTY HOSPITAL, Appellant,**

v.

**Richard S. SCHWEIKER, Secretary of Health and Human Services, Appellee.**

No. 82–1040.

United States Court of Appeals, Fourth Circuit.

Argued April 2, 1984.

Decided July 31, 1984.

Ernest J. Nauful, Jr., Columbia, S.C., for appellant.

Jeanne Schulte Scott, Dept. of Health and Human Services, Washington, D.C., (Henry Dargan McMaster, U.S. Atty., Mary

G. Slocum, Asst. U.S. Atty., Columbia, S.C., on brief), for appellee.

Before WINTER, Chief Judge, RUSSELL, Circuit Judge, and WARRINER,* District Judge.

HARRISON L. WINTER, Chief Judge:

Lexington County Hospital, a public nonprofit hospital owned by Lexington County, South Carolina, appeals from the district court decision upholding the decision of the Secretary of Health and Human Services to disallow reimbursement for various costs claimed by the hospital under the federal Medicare Program. Under that program, 42 U.S.C. §§ 1395 *et seq.*, the government directly reimburses participating hospitals for the "reasonable costs" of providing health care services to Medicare beneficiaries. The statute defines reasonable costs as those actually incurred and declares that they "shall be determined in accordance with regulations [promulgated by the Secretary] establishing the method or methods to be used, and the items to be included ..." 42 U.S.C. § 1395x(v)(1)(A).

In denying the hospital's claims, the Secretary relied on her regulations regarding the calculation of reasonable costs. The hospital does not dispute the validity of these regulations; it contests only their application and interpretation with regard to the facts of this case. The scope of our review is to determine whether the Secretary's actions were "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706. Applying this standard, we affirm.

## I.

■ We consider first the Secretary's denial of reimbursement for the hospital's depreciation of its share of an off-site sewer project. Early in the 1970's, the hospital, realizing that its on-site sewer system would be inadequate to meet future needs, agreed with the City of West Columbia to contribute $125,000 to the city's sewer expansion project in return for the city's extending its sewer lines to the hospital. The hospital made this agreement after considering a variety of options, including construction of a new on-site sewer, because it determined that joining the city's project was the least expensive of possible alternatives.

The Secretary disallowed the hospital's claim for depreciation of its share of the sewer project, in reliance on 42 C.F.R. § 405.415(a), which authorizes reimbursement for "depreciation on buildings and equipment used in the provision of patient care," but bars reimbursement for depreciation of land. While the Secretary and the hospital agree that land is, and should be, non-depreciable, they disagree as to whether the cost of off-site sewer lines is a cost of the land.

The Secretary classified it as such pursuant to her official interpretation of § 405.-415(a) in the Providers Reimbursement Manual.[1] *See* HIM–15 § 104.6. The specific language on which the Secretary relied follows:

> *Land (non-depreciable) includes the land owned and used in provider operations. Included in the cost of land are the costs of such items as off-site sewer and water lines,* public utility charges necessary to service the land, governmental assessments for street paving and sewers, the cost of permanent roadways and grading of a non-depreciable nature, the cost of curbs and sidewalks whose replacement is not the responsibility of the provider and other land expenditures of a non-depreciable nature.

(emphasis added). Because the guidelines in this manual are the agency's interpretation of its own regulations, they "should be accepted by the courts unless ... shown to be unreasonable or inconsistent with statutory authority." *Fairfax Nursing Center*

---

* Honorable D. Dortch Warriner, United States District Judge for the Eastern District of Virginia, sitting by designation.

1. This manual is published by the department as a guide to applying the Secretary's regulations.

*Inc. v. Califano,* 590 F.2d 1297, 1301 (4 Cir.1979); 5 U.S.C. § 706; *accord Loma Linda University v. Schweiker,* 705 F.2d 1123, 1126 (9 Cir.1983). Indeed, as the District of Columbia Circuit has pointed out in considering the regulations regarding reasonable costs:

> where the decision under review involves an agency's interpretation of its own regulations, forming part of a complex statutory scheme which the agency is charged with administering, the arguments for deference to administrative expertise are at their strongest.

*Psychiatric Inst. of Washington, D.C., Inc. v. Schweiker,* 669 F.2d 812, 813–14 (D.C.Cir.1981).

The hospital contends that the Secretary's interpretation of § 405.415(a) conflicts with other regulations and is inconsistent with the statute. The first argument may be easily dismissed. Although the hospital's contribution to the sewer project arguably is part of its cost of providing services to Medicare patients, that alone does not bring it within 42 C.F.R. § 405.418(b), which declares that when an asset is used in providing services, depreciation of that asset is reimbursable as a cost of providing services. This regulation obviously refers only to depreciable assets. Otherwise, it would require reimbursement for depreciation of land itself, and even the hospital agrees that land is not depreciable.

The argument that the Secretary's interpretation conflicts with regulations and other agency guidelines designed to encourage cost-efficiency and growth suitable for growing needs, *see* 42 C.F.R. § 405.-402(b)(6); HIM–15 § 2102.1, fails for the same reason. Those regulations and guidelines obviously do not require the Secretary to allow depreciation on land, the purchase of which also might be dictated by cost-efficiency and provision for future needs.

The real issue, then, is whether the Secretary properly treated depreciation of the cost of off-site sewer lines as a cost of the land. The record establishes that the Secretary's treatment is consistent with accepted accounting principles. *See, e.g.* G.

Welsch, Intermediate Accounting 475 (1979). Her decision to follow these principles is thus supported by the statute, which plainly gives her discretion to adopt generally accepted accounting principles under her mandate to promulgate regulations "establishing the ... methods to be used and the items to be included, in determining [reasonable and reimbursable] costs." 42 U.S.C. § 1395x(v)(1)(A).

Because accounting principles support her decision to classify the cost of off-site sewer lines as a cost of the land, her decision not to allow depreciation of these costs represents a reasonable interpretation of the regulation permitting depreciation of buildings and equipment, but not land. We see no merit in the hospital's contention that this interpretation is inconsistent with the statutory direction that "the necessary costs of efficiently delivering *covered* services to [covered] individuals ... [should] not be borne by individuals not so covered," 42 U.S.C. § 1395x(v)(1)(A) (emphasis added), and that the Secretary's interpretation has the effect of shifting to non-Medicare patients the full cost of providing the sewer service. The simple answer to this argument is that the statute forbids only cost-shifting of "covered" services. It, therefore, does not forbid shifting of the cost of an uncovered service. *North Clackamas Community Hospital v. Harris,* 664 F.2d 701, 707 (9 Cir.1980). As the Ninth Circuit observed, if the prohibition against cost-shifting were not so limited, no cost ever could be disallowed. *Id.*

## II.

Next we consider the hospital's challenge to the Secretary's refusal to grant special care unit status to certain beds in the hospital's medical intensive unit (MIU). That unit consists of eight beds. Four are reserved for coronary intensive care, and four, the swing beds, when not used for coronary intensive care, may be used for progressive care, a somewhat reduced level of services. The hospital claimed that all eight beds were part of a "special care unit" (SCU) and thus were

eligible, under the applicable regulation, for separate cost-accounting, which ordinarily would result in increased Medicare reimbursement. The Secretary denied SCU status to the four swing beds, reasoning that progressive care is not comparable to intensive care and that thus the beds being used for progressive care could not meet the regulatory definition of a SCU.

The hospital's only challenge to this aspect of the case is that the Secretary's interpretation of the regulation is arbitrary; the hospital does not claim that the Secretary's interpretation contravenes the statute. Accordingly, the only question is whether the Secretary's interpretation is "within the range of reasonable meanings that the words of the regulation admit." *Psychiatric Inst. of Washington, D.C. v. Schweiker,* 669 F.2d at 814. At the relevant time the regulation in question provided:

> *Intensive care units, coronary care units, and other special care in-patient hospital units.* To be considered an intensive care unit, coronary care unit, or other special care inpatient hospital unit, the unit must be in a hospital, must be one in which the care required is extraordinary and on a concentrated and continuous basis and must be physically identifiable as separate from general patient care areas. There shall be specific written policies for each of such designated units which include, but are not limited to burn, coronary care, pulmonary care, trauma, and intensive care units but exclude postoperative recovery rooms, postanesthesia recovery rooms, or maternity labor rooms.

42 C.F.R. § 405.452(d)(10) (1977). While the hospital contends that the regulation contemplated three levels of care—intensive, special, and routine—the Secretary asserts that the regulation meant that special care status was reserved for units that

were equivalent to an intensive care unit. This interpretation invokes the canon of *ejusdem generis* construction, that the general language ("other special care inpatient hospital unit") should be read as referring only to units similar to those specifically enumerated (intensive care units and coronary care units). *See White Memorial Medical Center v. Schweiker,* 640 F.2d 1126, 1129 (9 Cir.1981).

Both interpretations of the regulation appear reasonable; it follows that the Secretary's should control. *Fairfax Nursing Center, Inc. v. Califano,* 590 F.2d at 1301. All but one of the courts considering this issue have sustained the Secretary's consistent interpretation of this regulation. *See, e.g., Sun Towers Inc. v. Schweiker,* 694 F.2d 1036 (5 Cir.1983); *White Memorial* (9 Cir.1981); *Psychiatric Inst.* (D.C.Cir. 1981). *But see Community Hospital of Indianapolis v. Schweiker,* 717 F.2d 372, 375 (7 Cir.1983) (reasoning that the administrative construction was irrelevant because the meaning of the regulation was so obvious).[2] We note that, despite our decision to sustain the Secretary, the costs associated with the beds in question will be reimbursed under the regular averaging formula, although the Secretary's decision makes them ineligible for separate cost accounting treatment.

### III.

◼ Finally, we consider whether the Secretary reasonably found, under the applicable regulation, that the hospital was not entitled to use accelerated depreciation for the years in question. In the exercise of her discretion regarding the methods to be used in calculating reasonable costs, *see* 42 U.S.C. § 1395x(v)(1)(A), the Secretary has determined that providers ordinarily may claim only straight-line depreciation on their depreciable assets. As an exception to this general rule, however, she allows a

---

**2.** Although the hospital suggests that a decision of the United States District Court for the District of Columbia has adopted its position, this suggestion is misleading. That district court overturned the Secretary's ruling regarding SCU status, but its decision rested on a finding that

the progressive care unit in question provided "extraordinary, concentrated and continuous care to the same extent as a typical intensive care unit." *Los Alamitos General Hospital v. Donnelly,* 558 F.Supp. 1141, 1147 (D.D.C.1983), *appeal argued,* (D.C.Cir. Jan. 13, 1984).

provider to claim accelerated depreciation if it can establish a cash flow deficiency as defined by regulation. *See* 42 C.F.R. § 405.415(a)(3)(iii).

The hospital claims to have been entitled to use accelerated depreciation in fiscal years 1976 and 1977. The Secretary, relying on her official interpretation of the regulation in HIM–15 § 116.C, disagreed. Again, the hospital does not seriously suggest that the Secretary's interpretation is inconsistent with the statute.[3] Thus the only issue is whether the Secretary's interpretation of her own regulation is reasonable. The regulation in question permits a provider to use:

> A declining balance method, not to exceed 150 percent of the straight-line rate, for a depreciable asset acquired after the date specified in paragraph (h) of this section; however, this declining balance method may be used only where the cash flow from depreciation on the total assets of the institution during the reporting period, including straight-line depreciation on the assets in question, is insufficient ... to supply the funds required to meet the reasonable principal amortization schedules on the capital debts related to the provider's total depreciable assets.

42 C.F.R. § 405.415(a)(3)(iii). The Secretary's interpretation of that regulation limits the assets in the formula to those used in providing patient care services. Thus, under the Secretary's reading, the regulation means that the provider may use accelerated depreciation only if:

> the cash flow from depreciation on the total assets of the institution which are used to provide patient care services during the reporting period, including straight-line depreciation on the assets in question, is insufficient ... to supply the funds required to meet the reasonable principal amortization schedules on the

capital debts related to the provider's total depreciable assets used to provide patient care services.

HIM–15 § 116.C.

Relying on this interpretation, the Secretary refused to allow the hospital to treat the full $125,000 it paid toward the outstanding principal of construction bonds issued to finance new facilities as "funds required to meet the reasonable principal amortization schedules on the capital debts related to the provider's total depreciable assets." Because only about four percent of the new facilities were being used to provide patient care during the accounting period in question, the Secretary allowed the hospital to use only four percent of the $125,000 in the cash flow deficiency computation.

The hospital maintains that, in the regulation, the word "assets" is not limited to those used to provide patient care services and that the Secretary's interpretation thus works a substantive change in the regulation. We think that the Secretary's interpretation is reasonable, however, and that it should prevail. The regulation referred to "depreciable assets", and under 42 C.F.R. 405.415(a), depreciable assets are "buildings and equipment used in the provision of patient care." As the Secretary notes, this construction of "depreciable assets" accords with the statutory definition of reasonable costs—"those actually incurred ... in the ... delivery of needed health services." *See* 42 U.S.C. § 1395x(v)(1)(A). We thus sustain the Secretary's resolution of this issue as well as her decisions regarding the other issues raised by the hospital.

AFFIRMED.

---

**3.** Although it tries to suggest that the Secretary's interpretation would lead to cost-shifting that would be illegitimate under 42 U.S.C. § 1395x(v)(1)(A), the suggestion is obviously frivolous. The Secretary disallowed only accelerated depreciation, leaving the hospital free to claim straight-line depreciation. The latter rep-

resents the true cost to the hospital, and reimbursing the hospital for the portion of the straight-line depreciation attributable to Medicare patients assures that no cost-shifting occurs. Permitting the hospital to use accelerated depreciation would have allowed it to recapture more than its actual cost.