MERCY HOSPITAL AND MEDICAL CENTER, SAN DIEGO, a California non-profit organization, Plaintiff-Appellant,

v.

Patricia HARRIS, U.S. Department of Health and Human Services, Blue Cross of Southern California, a California Corporation; and Blue Cross Association, an Illinois Corporation, Defendants-Appellees.

No. 78–1425.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 3, 1979.

Decided Aug. 20, 1980.

Sneed, Circuit Judge, concurred specially and filed opinion.

Steven Gourley, Memel, Jacobs, Pierno & Gersh, Los Angeles, Cal., for plaintiff-appellant.

Jonathan Schuman, Baltimore, Md., argued for defendants-appellees; John R. Neece, Asst. U. S. Atty., San Diego, Cal., on brief.

Before SNEED and WRIGHT, Circuit Judges, and FITZGERALD,* District Judge.

* Honorable James M. Fitzgerald, United States District Judge, for the District of Alaska, sitting by designation.

1. See *Pacific Coast Medical Enterprises v. Harris*, Nos. 77-2914, 77-3281 (9th Cir. March 28, 1980) for a general discussion of the Medicare Act and reimbursement scheme.

2. Because the Secretary's decision did not rest on this ground, the district court's reasoning on

FITZGERALD, District Judge.

Mercy Hospital (Mercy) is a provider of services under the Medicare Act. 42 U.S.C. §§ 1395–1395rr.[1] Mercy appeals the district court's grant of summary judgment affirming the Secretary's denial of Mercy's claims for partial reimbursement of deficits arising from operation of its outpatient clinic.

The district court's jurisdiction was conferred by 42 U.S.C. § 1395oo(f) and the jurisdiction of this court is founded on 28 U.S.C. § 1291.

Mercy classified the operating deficit of its outpatient clinic as an educational expense because the clinic is operated primarily as an educational facility for Mercy's residents and interns. A hospital's educational expenses are deemed to benefit all patients and hence an appropriate part of those expenses is reimbursable under the Medicare Act. However, the district court rejected Mercy's educational classification because: (1) an administrative interpretation of the Medicare regulations provides that an educational activity which also involves a service to a patient shall be considered "usual patient care" rather than an educational activity for purposes of calculating the appropriate amount of Medicare reimbursement; and (2) the accounting system prescribed by the Medicare regulations does not permit any cost center with costs that can be traced to individual patients to reallocate those costs to any other patients when seeking Medicare reimbursement.

We reject the district court's reasoning that simply because patients are treated there Mercy could never establish that the costs of operating its outpatient clinic are reimbursable as educational costs.[2] Nonetheless, we affirm the district court's grant

this issue is dictum. *See Castillo-Felix v. INS*, 601 F.2d 459, 462 n. 6 (9th Cir. 1979). However, because the district court's decision has been reported and because we disapprove its reasoning, we address the issue here. See Health Care Financing Administrative Rulings, Publication No. MBR 3, pp. 93–94 (April 1979); *see generally Memorial, Inc. v. Harris*, No. 78 3169 (9th Cir. March 28, 1980).

of summary judgment affirming the Secretary's decision. That decision rested squarely on the Secretary's determination that Mercy's outpatient clinic is a revenue-producing center. Mercy charges the patients treated in the clinic for the services rendered to them. The regulations define revenue-producing centers in terms of whether charges for their services can be directly traced to particular patients and preclude reallocation of deficits where such is the case. Hence, Mercy's own billing practice precludes it from reallocating the clinic's cost whether it be deemed primarily educational or not.

## I

### Standard of Review

Our review of these issues is limited to determining whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole. 5 U.S.C. § 706(2). *See Pacific Coast Medical Enterprises v. Harris,* Nos. 77–2914, 77–3281 (9th Cir. March 28, 1980); *Good Samaritan Hospital, Corvallis v. Mathews,* 609 F.2d 949, 951 (9th Cir. 1979). In this case the agency acted pursuant to its own interpretations of the Medicare Act and its accompanying regulations. In reviewing an agency's interpretations

> We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such judgment in a particular case will depend upon the thor-

oughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which gave it power to persuade, if lacking power to control. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *Good Samaritan,* 609 F.2d at 954.

## II

### Usual Patient Care

Mercy's outpatient clinic is a multipurpose department receiving approximately 30,000 patient visits a year. It was opened and is operated as an adjunct to Mercy's educational programs and is, in fact, a necessary component if those programs are to be approved for Medicare purposes. Patients are selected in order to provide appropriate learning experience to Mercy's interns and residents. Patients who are able to pay are encouraged to see an outside physician in order that the clinic will not be in competition with the private physicians who volunteer their time to serve as the clinic's teaching staff. Despite the fact that the majority of the clinic's patients are unable to pay for the care they receive, Mercy bills them in an effort to defray as much of the clinic's cost as possible. Medicare pays the normal part of the charges assessed against Medicare patients treated at the clinic.

Mercy's accounting method first set off patient payments and grants against the operating costs of the clinic; then added the resulting net deficit to the overall net costs of the educational programs of the hospital;[3] and finally reallocated those educational costs to the various inpatient departments whose patients are deemed to be the ultimate beneficiaries of the enhanced

---

**3.** Medicare reimburses an "appropriate" part of the net costs of approved educational activities. 42 CFR § 405.421(a) (1979). An appropriate part is the approximate portion of the total net costs that equals the portion of the hospital's total services that is provided to Medicare patients. The net cost of educational activities is defined as:

> the cost of approved educational activities (including stipends of trainees, compensation

of teachers, and other costs), less any reimbursements from grants, tuition, and specific donations.

42 CFR § 405.421(b)(2) (1979). Mercy contends that because the clinic is necessary for their educational programs to be approved, it should be considered as part of the "other costs" allowed by the regulations.

skills of the interns and residents who participate in the educational programs.[4]

The district court found that as long as any patient benefits directly from the services provided in the clinic, the costs of that service may not be reallocated to secondary beneficiaries as educational costs. This position is set forth in the Social Security Administrative Manual, HIM–15,[5] which provides in § 402.2 that

> The net cost of approved educational activities cannot include any cost of usual patient care as explained in § 502.2. *Example*: A hospital has set aside beds as a teaching unit and residents of the hospital's approved educational program generally provide the physician care for the Medicare and non-Medicare beneficiaries occupying these beds. The hospital wishes to consider as educational costs the unrecovered cost or charges of usual patient care rendered to these patients. It must be recognized that there are two components of cost in furnishing services to these teaching patients—net educational costs (as defined in the first sentence of this section) and usual patient care costs as defined in § 502.2. A hospital may not allocate the unrecovered cost or the unrecovered charges of usual patient care for this unit as an educational cost. If this allocation is made, Medicare would be reimbursing the provider for services furnished non-Medicare beneficiaries. Medicare reimburses its share of the patient care for this unit in the same way it reimburses for patient care services of other patients in the hospital. A separate routine cost center for these beds may not be established for the purpose of identifying unrecovered costs to be claimed as net costs of approved educational activities.

■ Mercy argues that this provision is inconsistent with the Medicare Act and regulations because it shifts the entire burden of supporting the clinic, which benefits both Medicare and non-Medicare patients, to Mercy's non-Medicare patients. *See* 42 U.S.C. § 1395x(v)(1)(A). Insofar as this argument is based on the premise that Medicare is required to reimburse its proportionate share of all educational costs we must reject it. The regulations require only that the program "participate appropriately." 42 C.F.R. § 405.421(c) (1979); *see Board of Regents of the State of Florida v. Califano*, 586 F.2d 451, 455–56 (5th Cir. 1978). Because every experience arguably has some marginal educational value to an intern or resident, administrative necessity requires that the Secretary adopt some definitions to facilitate determination of what particular activities can be considered primarily educational for the purposes of reimbursement.

However, Mercy further argues that the definition in this case is arbitrary and capricious. "Usual patient care" is defined in HIM–15, § 502.2 as

> the care which is medically reasonable, necessary, and ordinarily furnished (absent any research programs) in the treatment of patients by providers under the supervision of physicians as indicated by the medical condition of the patient.

Section 502.2 defines usual patient care for the purposes of distinguishing between recoverable patient care costs and non-recoverable research costs. *See* 42 C.F.R. § 405.-422(a) (1979). Mercy points out that in § 502.2 the Secretary has specifically recognized in the context of research activities that the existence of a research program is sufficient to distinguish an otherwise identical treatment program from usual patient care.

Mercy argues that it is arbitrary and capricious to apply that same provision in the context of educational activities without recognizing that a treatment program that is purely incidental to an educational

---

4. The net educational costs are allocated to various inpatient departments in the same proportion as resident and intern time is divided among those departments.

5. The manual is also known as the Medicare Provider Reimbursement Manual. It is published by the Secretary as a guide for providers to determine the "reasonable cost" of furnishing patient care services to Medicare beneficiaries.

program is equally distinguishable from usual patient care. In fact the gist of all of the evidence Mercy presented at the administrative hearing was that the care provided in the clinic is secondary to its educational goals. A witness for Mercy testified that extensive time was devoted to otherwise routine diagnosis and treatment planning because of the program's purpose to teach the staff rather than simply to treat the patient.

■ Mercy's argument is persuasive. Because the mere presence of patients in research activities does not cause those activities to become usual patient care, by a parity of reasoning their presence in educational diagnosis and treatment planning activities should not, in itself, absolutely establish that those activities must be classified as usual patient care. A proper interpretation of HIM–15, § 502.2 as incorporated in § 402.2 should allow a hospital to avoid the apparent bar to allocating such costs as educational costs upon a showing that the patient care activities involved are primarily dictated by the objectives of an overriding educational program. The Secretary's failure to allow for such a showing is arbitrary.

### III

### Accounting Method

■ Nonetheless, the Secretary contends that the accounting method set forth in the regulations precludes reallocation of Mercy's clinic costs. The regulations require Mercy to use step-down accounting. 42 C.F.R. § 405.453(d)(1) (1979). This method

6. For example, hospitals A, B, and C each centralize their record keeping. Hospital A charges each patient a $10 records fee. Hospitals B and C make no separate charge for records, but hospital B does charge $.10 a page for copies of records requested by patients or physicians outside the hospital. Fifty percent of each hospital's patients are covered by Medicare.

At the end of a year the record keeping departments of hospitals A, B, and C show the following:

allows a hospital to allocate the net deficit of a "nonrevenue-producing center" to all other centers that it serves, but does not allow allocation of deficits that arise in "revenue-producing" centers. Although no specific definition of "revenue-producing" is contained in the regulations, 42 C.F.R. § 405.404(a)(1) (1979) suggests that a revenue-producing department is one furnishing services to patients for which charges are made.

The basic principle in determining the reasonable cost of services that Medicare will reimburse is that

the costs with respect to individuals covered by the insurance programs established by this title will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs.

42 U.S.C. § 1395x(v)(1)(A). Under the Secretary's interpretation of "revenue-producing," any department that charges patients directly for its services, whether the department operates at a profit or a loss, is presumed to be billing the actual cost of the services provided and hence can only recover from Medicare for the amounts actually billed to Medicare patients.[6] Mercy argues that although its outpatient clinic charges the patients it directly serves, all of the inpatients in the hospital indirectly benefit and hence Medicare patients should share in covering the clinic deficit instead of shifting it all to non-Medicare inpatients in the form of a surcharge on their bills.

| | Hospital A | Hospital B | Hospital C |
|---|---|---|---|
| Total Costs | $10,000 | $10,000 | $10,000 |
| Patient charges | 9,000 | | |
| Copying fees | | 1,000 | |
| Net Loss | $ 1,000 | $ 9,000 | $10,000 |

Although the record keeping departments of both hospital A and hospital B produce income, only hospital A charges its patients and hence only A's record keeping department is a revenue-producing department: Hospital A cannot allocate any part of its $1,000 loss to Medicare patients but may recover $4,500 (50% of the $9,000 charged to patients) from Medicare. Hospital B can also recover $4,500 by allocating its $9,000 loss to the accounts of patient

At the time the Medicare provisions were enacted Congress was aware of the complexities of determining reasonable costs for services to be provided under the program. Hence the agency was afforded a great deal of discretion in promulgating its regulations. *See* 42 U.S.C. § 1395x(v)(1)(A). Given the significant number of variables to be considered in determining the reasonable costs of Medicare services, the results will necessarily be imprecise.

The Secretary's interpretation of the regulations provides an administrable method of determining the costs of services provided to Medicare patients. Hospitals are free to adjust their own billing procedures to reflect their actual costs. We do not believe that it is unreasonable for the Secretary to decline to further complicate the accounting required for Medicare reimbursement by allowing for secondary benefits that may accrue to inpatients from the educational aspects of the clinic program. Insofar as Mercy contends that the inpatients receive the direct benefits from the clinic's educational program while the clinic patients are merely guinea pigs for that program, it may adjust its billing procedures to reflect that judgment by ceasing to charge the clinic patients.

The judgment of the district court is AFFIRMED.

SNEED, Circuit Judge, specially concurring.

I concur in the result reached by Judge Fitzgerald's opinion. However, I am reluctant to join in dicta that suggests that Mercy can achieve reimbursement merely by ceasing to charge all outpatients for outpatient clinic services. Perhaps under all the relevant facts presented by a particular case that would be a proper result; but it is better, I think, not to prejudge the issue. In addition, it is unnecessary, in my view, to charge the Secretary with arbitrary conduct that does not control the judgment of this court. It would be more appropriate for us merely to suggest that it might be arbitrary under proper circumstances not to allow "a hospital to avoid the apparent bar to allocating such costs [educational diagnosis and treatment of planning activities] as educational costs upon a showing that the patient care activities involved are primarily dictated by the objectives of an overriding educational program." *See* p. 909.

---

service centers and collecting through them. Hospital C may allocate its entire $10,000 deficit to patient service centers and will ultimately recover $5,000 from Medicare.