664 F.2d 701
 NORTH CLACKAMAS COMMUNITY HOSPITAL, dba Dwyer Memorial
Hospital, Plaintiff-Appellant,
v.
Patricia HARRIS,* Secretary of Health and Human
Services, the United Statesof America; Provider
Reimbursement Review Board; Blue Cross
Association andBlue Cross of
Oregon,
Defendants-
Appellees.
 No. 77-2556.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 12, 1979.
Decided Dec. 31, 1980.
 
 Joy D. Abele, Jack, Goodwin & Urbigkeit, Oregon City, Or., for plaintiff-appellant.
 Patrick E. McBride, Seattle, Wash., for defendants-appellees.
 Appeal from the United States District Court for the District of Oregon.
 Before WALLACE and KENNEDY, Circuit Judges, and ORRICK,** District Judge.
 KENNEDY, Circuit Judge:
 
 
 1
 In 1971, North Clackamas Community Hospital (NCCH), an Oregon nonprofit corporation, purchased Dwyer Memorial Hospital. Thereafter, it sought reimbursement under the Medicare Act, 42 U.S.C. §§ 1395-1395rr (1976 & Supp. II 1978), for the yearly amortization of certain intangible assets acquired in the purchase. Blue Cross of Oregon, as agent of the United States, disallowed the reimbursement, and the appellee Secretary,[1] through the Provider Reimbursement Review Board (PRRB),[2] affirmed. NCCH appealed to the Oregon district court under 42 U.S.C. § 1395oo (f) (1976). That court affirmed the PRRB's decision. NCCH has again appealed. Our jurisdiction rests on 28 U.S.C. § 1291 (1976).
 
 
 2
 Robert Dwyer owned the only hospital in Milwaukie, Oregon, a town some ten miles south of Portland. In early 1970, certain citizens of Milwaukie became concerned upon hearing that Mr. Dwyer planned to sell the hospital to the Kaiser Health Plan. Kaiser is a closed group plan and the proposed sale would have effectively forced the residents and doctors of Milwaukie either to travel some seven miles to the nearest general hospital or to join Kaiser. To prevent this, NCCH was formed as an Oregon nonprofit corporation. After its incorporators discovered that the cost of building a new hospital and the cost of purchasing Dwyer's hospital were approximately the same, serious negotiations with Robert Dwyer and his family[3] began. The talks were extensive and time-consuming. Fourteen months after negotiations began, NCCH contracted with the Dwyers to sell the hospital, along with other related items, for the lump sum price of $2,674,015.
 
 
 3
 The parties had not reached agreement, however, on allocation of the price to the purchased assets. The PRRB found that they agreed that an independent appraiser would make the allocation. The appraiser chosen by the parties allocated the purchase price as follows:
 
 
 4
 Land and buildings $1,837,230
Medical clinic 290,369
Operating company - net
 tangible assets 105,830
Hospital license and
 purchased operating value
 (Going Concern Value) 440,586
 ----------
 TOTAL. . . . . . . . $2,674,015
 
 
 5
 NCCH began operations, retaining the name "Dwyer Memorial Hospital." As a qualified provider under the Medicare Act,[4] it applied to Blue Cross of Oregon, the Medicare intermediary,[5] for reimbursement of services provided to Medicare patients during its first year of operation. Among these services were the purchase costs of Dwyer Memorial allocable to Medicare patients. Specifically, NCCH sought reimbursement for depreciation taken on buildings and for amortization taken on the part of the purchase price allocated to what we refer to as "GCV" and what the appraiser referred to as "Hospital license and purchased operating value (Going Concern Value)." It also sought reimbursement for interest expense relating to these items.
 
 
 6
 Blue Cross approved the depreciation reimbursement, but disallowed reimbursement for GCV amortization or any interest expense related to it. The total amount disallowed was $53,135. NCCH then took its case to the PRRB. NCCH contended that the appraisal was inaccurate and that the tangible assets should have been valued at a higher price. As a second ground, it claimed that GCV was an intangible asset related to health care provision and thus reimbursable in any event. According to NCCH, the Dwyers made inclusion of GCV in the sale an essential part of the deal so that its purchase was a necessary condition of the purchase of the hospital. Since the intermediary allowed depreciation on other property purchased, such as buildings, NCCH argued that Blue Cross should have allowed amortization of GCV as well.
 
 
 7
 The PRRB declined to allow the reimbursement. It found that the parties contractually agreed to be bound by the appraiser's appraisal and allocation. It concluded that the amount allocated to GCV by the appraiser was excludable from tangible assets or any other reimbursable category. The PRRB concluded further that the $440,586 figure represented a type of goodwill, composed of the hospital's functioning professional and technical staff, its established reputation in the community, and the purchasers' collective desire to stay in Milwaukie for hospital care. The PRRB held this to be unrelated to the provision of medical services. The district court affirmed the PRRB's determination, finding it rational, within its discretion, and in accordance with applicable law.
 
 
 8
 NCCH seeks review of the PRRB's decision that the price paid in excess of the net appraised value was not related to patient care and thus not reimbursable under the Medicare Act. In such cases, 42 U.S.C. § 1395oo (f) (1976) requires us to apply the standard of review applicable to actions arising under the Administrative Procedure Act. Our review is "limited to determining whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." Mercy Hospital & Medical Center, San Diego v. Harris, 625 F.2d 905, 907 (9th Cir. 1980). This standard is supplemented by deference to the agency's interpretation of its own regulations where, as here, the agency has expertise in the substantive area involved and the regulations were promulgated pursuant to congressional authorization. Id.; Pacific Coast Medical Enterprises v. Harris, 633 F.2d 123, at 130 (9th Cir. 1980); Columbus Community Hospital, Inc. v. Califano, 614 F.2d 181 (8th Cir. 1980); Good Samaritan Hospital, Corvallis v. Mathews, 609 F.2d 949, 954 (9th Cir. 1979). See also Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980). When this standard of review is applicable, the agency determination will not be set aside unless it is "clearly erroneous or inconsistent with the regulation," Pacific Coast Medical Enterprises, supra, or "demonstrably irrational." Milhollin, 444 U.S. at 565, 100 S.Ct. at 796.
 
 
 9
 NCCH's contentions on appeal are essentially the same as below. All agree, it asserts, that the hospital provides reimbursable medical services for Medicare patients. Further, NCCH maintains that the hospital could not have been acquired without some allocation of the purchase price to GCV.[6] It argues from this fact that since the acquisition of GCV was necessary to the ultimate provision of admittedly reimbursable services, the annual amortization of GCV is a necessary and reasonable cost. NCCH concludes that the denial of reimbursement violates 42 U.S.C. §§ 1395f(b) (1976 & Supp. II 1978) and 1395x(v)(1)(A) (1976), which define a reimbursable, reasonable cost as any "cost actually incurred."[7] It further contends that the Medicare regulations providing for reimbursement of those "costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities" are also violated by the agency ruling. See 42 C.F.R. § 405.451(b)(2) (1979).[8]
 
 
 10
 As a corollary argument, NCCH contends that if we affirm the denial of reimbursement, it will be forced to charge non-Medicare patients proportionately more to recover its initial investment. NCCH points to statutory language[9] and regulations[10] which seemingly prohibit such a result.
 
 
 11
 We reject both arguments. The PRRB and the district court below both found that denial of reimbursement was consistent with the Medicare scheme. Under the applicable standard of review, we do not disturb these findings.
 
 
 12
 NCCH's first argument proves too much. If health care providers could automatically receive reimbursement for all components of an acquisition simply because they were a contractual condition of the sale, integrity of the reimbursement system would be undermined. Any such holding would have the effect of transferring the determination of what is a reasonable expense from the congressionally authorized agencies, i. e. the PRRB and the Health Care Financing Administration, to the seller of the hospital. There would be, inevitably, a temptation, then a tendency for buyers and sellers to include in the sale contract items totally unrelated to health care. This was not intended by Congress, and we decline the opportunity to graft such a requirement on the Medicare scheme.
 
 
 13
 The PRRB found that GCV "represent(ed) an amount the Provider was willing to pay beyond the fair market value of specific identifiable tangible assets in order to conduct its business," and that GCV was "more akin to goodwill than to any other asset."[11] NCCH attempts to distinguish its case from established Medicare regulations[12] and interpretive rules[13] prohibiting reimbursement for goodwill for profitmaking providers. Its attempted distinction rests on the fact that it is a nonprofit corporation.
 
 
 14
 We cannot say, however, that the PRRB's construction of the Medicare regulations, unmodified by the Secretary, was either "demonstrably irrational," Milhollin, 444 U.S. at 565, 100 S.Ct. at 797, or "clearly erroneous or inconsistent with the regulation." Pacific Coast Medical Enterprises, at 633 F.2d 130. We find that the Secretary was within his discretion in holding that the reimbursable character of goodwill does not turn critically on whether the provider is profit-making or not, as the rationale behind the exclusion of goodwill applies with equal force to both classes of providers.
 
 
 15
 Since 1970, the Secretary has maintained that goodwill is not reimbursable. 35 Fed.Reg. 12,330 (1970).[14] The basis for this exclusion has been that "goodwill is generally considered to be the attainment of profit in excess of a normal rate of return and, as the attainment of excess profits is not related to the delivery of needed health services, reimbursement for goodwill is not permitted by statute." 41 Fed.Reg. 46,292 (1976). NCCH argues that it is a nonprofit corporation and, as such, cannot legally earn excess profits. It thus attempts to designate GCV as not included within the Secretary's definition of goodwill.[15] But this misses the point. Goodwill, as determined by the Secretary,[16] represents the capacity to earn profits in excess of the normal rate of return due to establishment of a favorable community reputation and consumer identification of the business name.[17] The PRRB's determination that goodwill existed at the time of the sale established, at a minimum, that the Dwyers, as owners of the hospital, possessed that capacity. By selling the hospital and the hospital operating company to NCCH, the Dwyers merely passed on this capacity. Even if we agree that NCCH will not exploit the goodwill for purposes of earning excess profits,[18] it does not follow that NCCH should receive reimbursement for its purchase. This would have the effect of indirectly reimbursing the Dwyers for the goodwill they established.[19] The end result would be that Medicare funds would be used to reimburse the cost of obtaining goodwill, a cost the Secretary, in the exercise of his delegated discretion, has determined is not reimbursable.
 
 
 16
 Even if we assume, moreover, that some of GCV was not attributable to goodwill, it does not automatically follow that we must reverse the PRRB and the district court. In the proceeding below, the NCCH argued that GCV was really an intangible asset akin to "going concern value."[20] Going concern value is an intangible asset distinct from goodwill. In the tax area, where such classifications are important for the determination of allowable deductions, going concern value has been described as "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." VGS Corp. v. Commissioner, 68 T.C. 563, 591 (1977). Accord: Northern Natural Gas Co. v. United States, 470 F.2d 1107, 1108 (8th Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). Indeed, the PRRB found that GCV was comprised of some similar elements. It found that one of the considerations behind the premium paid was "(t)he fact that the hospital was a licensed ongoing operating entity consisting of a professional staff of doctors, nurses, technicians and a nonprofessional staff; and it had a reputable standing in the community."
 
 
 17
 This cost, however, is similarly not reimbursable. First, with respect to the portion of GCV attributable to going concern value, the PRRB itself found that "any possible valuation related to this intangible asset cannot be ascertained with any reasonable certainty." It thus found that there was no value that could be established which would provide a firm basis for the amortization. Further, "going concern value does not wear out with the individual assets." United States v. Cornish, 348 F.2d 175, 185 (9th Cir. 1965). As such, no useful life can be estimated. See 26 C.F.R. § 1.167(a)-3 (1980) (as no useful life can be estimated, goodwill is not deductible expense). Given these inherent difficulties in ascertaining the portion of GCV attributable to going concern value and the useful life of that portion, the Secretary was well within his discretion in interpreting Medicare regulations to preclude reimbursement.
 
 
 18
 NCCH's final argument, that denial of reimbursement will unfairly shift the hospital's costs to non-Medicare patients, is also without merit. In authorizing the Secretary to promulgate regulations establishing the methods to be used to determine reasonable cost, Congress expressly stated that any such method must assure that "the necessary costs of efficiently delivering covered services ... will not be borne by individuals not so covered ...." 42 U.S.C. § 1395x(v)(1)(A)(i) (1976) (emphasis added). The key point here is that Congress provided only that the cost of "covered" services should not be unfairly shifted to non-Medicare patients. Here, we have determined that the PRRB was not "demonstrably irrational," Milhollin, 444 U.S. at 565, 100 S.Ct. at 797, in interpreting the applicable statutes and regulations to exclude reimbursement of GCV. It follows from this that the PRRB determined GCV is not a "covered" service and, thus, Congress' mandate not to shift Medicare costs unjustly is not implicated. Put another way, the statute merely provides that reimbursable costs shall not be shifted to non-Medicare patients, a proposition analytically distinct from the view that all costs of providing care to Medicare patients should be reimbursed.
 
 
 19
 Finally, it follows that if the portion of the loan used to purchase GCV was not related to patient care, then interest attributable to that loan portion is also not reimbursable. 42 C.F.R. § 405.419(d) (1979).
 
 
 20
 The district court's order affirming the decision of the PRRB is AFFIRMED.
 
 
 
 *
 We substitute Patricia Harris, the Secretary of the Department of Health and Human Services, as successor to the original appellee David Mathews, the Secretary of the former Department of Health, Education and Welfare, pursuant to Fed.R.App.P. 43
 
 
 **
 Honorable William H. Orrick, Jr., United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 Throughout this opinion, "Secretary" shall mean either the Secretary of the Department of Health, Education and Welfare or its successor, the Department of Health and Human Services, whichever is relevant. Act of October 17, 1979, Pub.L. 96-88, 93 Stat. 696
 
 
 [2]
 The Medicare Act provides for a complex administrative review scheme. When, as here, an amount in controversy was incurred after 1973 and is $10,000 or more, the Provider Reimbursement Review Board (PRRB) has initial jurisdiction to hear the case. 42 U.S.C. § 1395oo (a) (1976)
 The PRRB consists of five members appointed by the Secretary. 42 U.S.C. § 1395oo (h) (1976). All five must be expert in the area of cost reimbursement; at least one must be a certified public accountant. Id.
 All PRRB decisions become final agency decisions unless reversed or modified by the Secretary within sixty days of decision. 42 U.S.C. § 1395oo (f)(1) (1976). Prior to 1978, the Secretary delegated such review functions to the Commissioner of Social Security. 33 Fed.Reg. 5836 (1968). Since then, however, the Administrator of the Health Care Financing Administration has performed this chore. Act of June 13, 1978, Pub.L. 95-292, § 5, 92 Stat. 307. See Medical Center of Independence v. Harris, 628 F.2d 1113, 1117 n.4 (8th Cir. 1980).
 
 
 [3]
 Robert Dwyer was only a co-owner of the hospital and its facilities. The physical plant was owned jointly with his wife; the hospital operating company was a closely held corporation of which Dwyer owned one-half of the stock. The other half of the stock was owned by his son, Robert Dwyer, Jr
 
 
 [4]
 See 42 U.S.C. §§ 1395x(v), 1395cc (1976). For a more extensive review of the administrative machinery of the Medicare Act, see Pacific Coast Medical Enterprises v. Harris, 633 F.2d 123 (9th Cir. 1980)
 
 
 [5]
 42 U.S.C. § 1395h (1976)
 
 
 [6]
 Apparently, the Dwyers insisted on some allocation of the purchase price to the hospital operating company, or goodwill, which was co-owned by Robert Dwyer, Sr., and Robert Dwyer, Jr. See note 3 supra. This furthered the Dwyers' interests in two ways. First, a significant percentage of the purchase price, or approximately 17%, was recognized as a capital gain without any recapture of depreciation. Second, Robert Dwyer, Jr., a lower basis taxpayer, would receive one-half of this gain, thus minimizing the overall tax liability of the Dwyers. The operating company would then be liquidated under 26 U.S.C. § 337 (1976) to maximize gain
 
 
 [7]
 The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services
 42 U.S.C. § 1395x(v)(1)(A) (1976).
 
 
 [8]
 Necessary and proper costs are costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs which are common and accepted occurrences in the field of the provider's activity
 
 
 [42]
 C.F.R. § 405.451(b)(2) (1979)
 
 
 [9]
 Such regulations shall (i) take into account both direct and indirect costs of providers of services ... in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered
 42 U.S.C. § 1395x(v)(1)(A) (1976).
 
 
 [10]
 The regulations in this subpart take into account both direct and indirect costs of providers of services. The objective is that under the methods of determining costs, the costs with respect to individuals covered by the program will not be borne by individuals not so covered,
 
 
 [42]
 C.F.R. § 405.451(b)(1) (1979)
 
 
 [11]
 This determination was in accordance with standard accounting practices made applicable by 42 C.F.R. § 405.406(a) (1979). See American Institute of Certified Public Accountants, Inc., Accounting Principles Board, Opinion 16, Business Combinations PP 8, 87 (1970); id., Opinion 17, Intangible Assets P 1 (1970). See note 17 infra
 
 
 [12]
 Acquisitions after July 1970. With respect to a facility or any tangible assets of a facility acquired on or after August 1, 1970, the excess of the price paid for such facility or such tangible assets over the historical cost, as defined in § 405.415(b), or the cost basis, as determined under § 405.415(g) (whichever is appropriate), is not includable in equity capital, and loans made to finance such excess portion of the cost of such acquisitions (see § 405.419(d)) are excluded in computing equity capital
 
 
 [42]
 C.F.R. § 405.429(b)(2) (1979)
 
 
 [13]
 The Provider Reimbursement Manual, HIM-15, published by the Social Security Administration as part of a series of explanatory guides to the Medicare and Medicaid statutes, states:
 For facilities or tangible assets acquired after July 1970, the excess of the purchase price paid for a facility or asset over ... (2) the cost basis of the tangible assets ... is not includable in the computation of equity capital.
 Id. § 1215.
 Courts have recognized that the Provider Reimbursement Manual is helpful in determining the meaning of Medicare Regulations. Good Samaritan Hospital, Corvallis v. Mathews, 609 F.2d 949, 954 (9th Cir. 1979); Gosman v. United States, 573 F.2d 31, 39, 215 Ct.Cl. 617 (1978); Overlook Nursing Home, Inc. v. United States, 556 F.2d 500, 505 (Ct.Cl.1977).
 
 
 [14]
 This case, inasmuch as it involves a post-1970 sale, is thus distinguishable from recent cases allowing goodwill for pre-1970 sales. See Pacific Coast Medical Enterprises v. Harris, 633 F.2d 123, 138 (9th Cir. 1980); Memorial, Inc. v. Harris, --- F.2d ----, at ---- (9th Cir. 1980). See also Homan & Crimen, Inc. v. Harris, 626 F.2d 1201 (5th Cir. 1980)
 
 
 [15]
 NCCH attempted below to categorize GCV as other intangible assets. Its prime candidates included "going concern value" and favorable lease terms. While we discuss "going concern value" infra, we note that favorable lease terms are deductible. See, e. g., PRRB Hearing Dec.No. 79-D62, (1979-2 Transfer Binder) CCH Medicare & Medicaid Guide P 30,156, aff'd, HCFA Admin.Dec. of Dec. 4, 1979, (1980-1 Transfer Binder) CCH Medicare & Medicaid Guide P 30,323 (1979). The PRRB, however, found that there was "no substantial merit" to NCCH's claims on this point because it was "too speculative to ascertain what may have happened in the absence of the two contracts held by the seller." In addition, the PRRB found that the assertedly low interest rates on the mortgage "do not appear so low as to warrant any revaluation...." As NCCH does not contest this determination on appeal, we do not pass on the PRRB's determination
 
 
 [16]
 The Secretary normally follows generally accepted accounting practices, 42 C.F.R. § 405.406(a) (1979), but when these practices do not accurately reflect the cost of patient care, as opposed to the cost of running a business, the Secretary reserves the right to prescribe different accounting practices. See 41 Fed.Reg. 46,292 (1976)
 
 
 [17]
 This determination is consonant with court and agency findings defining goodwill under the Medicare and other federal statutes. See, e. g., Levitt Corp. v. Levitt, 593 F.2d 463, 468 (2d Cir. 1979) (trademark infringement); Gosman v. United States, 573 F.2d 31, 37 n.8, 215 Ct.Cl. 617 (1978) (Medicare statute) (dicta); Karan v. Commissioner of Internal Revenue, 319 F.2d 303, 306 (7th Cir. 1963) (tax laws); Health Care Financing Administrator Decision of Dec. 4, 1979, (1980-1 Transfer Binder) CCH Medicare & Medicaid Guide P 30,323, at 9107; 1 CCH Medicare & Medicaid Guide P 5799 (1980). See also note 11 supra
 
 
 [18]
 We note, however, that NCCH has kept the hospital's former name, Dwyer Memorial Hospital, and such name retention indicates the desire to maintain consumer identity. See Karan v. Commissioner of Internal Revenue, 319 F.2d 303, 306 (7th Cir. 1963)
 
 
 [19]
 Self-generated goodwill was not reimbursable even under the pre-1970 regulations. 42 C.F.R. § 405.429 (1979); Provider Reimbursement Manual, supra note 14, § 1214 (Nov. 1968 Rev.)
 
 
 [20]
 NCCH also argued that the intangible asset was attributable to favorable lease terms. The PRRB, however, rejected this contention and NCCH does not challenge that here. See note 12 supra