**The QUEEN'S MEDICAL CENTER, Plaintiff,**

v.

**Louis W. SULLIVAN, M.D., Secretary of the Department of Health and Human Services, Defendant.**

**Civ. No. 91–00083 DAE.**

United States District Court, D. Hawaii.

Dec. 18, 1991.

Phillip F. Moon, Honolulu, Hawaii, Patric Hooper, Hooper Lundy & Bookman, Inc., Los Angeles, Cal., for plaintiff.

Thomas Helper, Asst. U.S. Atty., Honolulu, Hawaii, for defendant.

## ORDER GRANTING DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

DAVID ALAN EZRA, District Judge.

On December 16, 1991, the court heard the parties' motions for summary judgment. Phillip F. Moon, Esq. and Patric Hooper, Esq. appeared on behalf of plaintiff Queen's Medical Center ("Queen's"); Assistant United States Attorney Thomas Helper appeared on behalf of defendant Louis W. Sullivan, M.D., Secretary of the Department of Health and Human Services ("Secretary"). After reviewing the motions and the supporting and opposing memoranda and hearing oral arguments, the court grants the Secretary's cross-motion for summary judgment and denies Queen's' motion for summary judgment.

### BACKGROUND

From September 1, 1976 to September 1, 1983, Queen's participated in the State of Hawaii's Patients' Compensation Fund ("PCF"), a state operated medical malpractice insurance fund. The PCF provided insurance coverage for medical malpractice losses between $100,000 ($200,000 beginning September 1, 1982) and $1,000,000.

On September 1, 1983, Queen's withdrew from the PCF and obtained new insurance to replace the PCF. The new coverage, however, only protected Queen's for malpractice incidents occurring on or after September 1, 1983. The PCF continued to be responsible for insuring Queen's for malpractice incidents occurring prior to September 1, 1983.

On May 31, 1984, the PCF was repealed due to insolvency. At this point, the liability for malpractice losses between $100,000 and $1,000,000 resulting from occurrences prior to September 1, 1983 reverted to Queen's. Queen's remained uninsured for the losses previously covered by the PCF until February 1985 when Queen's established a self-insurance trust fund to insure such losses.

Based on actuarial studies of Queen's incurred but not reported ("IBNR") liabilities and a reserve analysis of reported/known claims, Queen's' gap in insurance coverage represented an estimated "contingent liability" of $3.4 million, consisting of $2.8 million for reported incidents of malpractice and $600,000 for IBNR liabilities. Queen's recorded the $3.4 million as an administrative service expense on its financial statements ("books") for its fiscal year ending June 30, 1984.

Queen's included the $3.4 million in its cost of malpractice insurance coverage for the 1984 Medicare cost reporting period which also ended on June 30, 1984. The fiscal intermediary, Hawaii Medical Service Association, disallowed the $3.4 million contingent liability for malpractice claims relying on Provider Reimbursement Manual section 2162 ("PRM" or "Manual"). Queen's then requested a hearing with the Provider Reimbursement Review Board ("PRRB") to challenge the fiscal intermediary's decision. The amount of Medicare reimbursement affected by the disallowance is approximately $498,000.

On October 24, 1990, the PRRB reversed the fiscal intermediary's adverse audit adjustment. The PRRB concluded that the $3.4 million sum was required to be treated as a cost incurred during the 1984 fiscal year under accrual accounting principles.

On December 29, 1990, the Health Care Financing Administration ("HCFA") Administrator modified the PRRB's decision. The Administrator determined that Queen's was entitled to be reimbursed only for those claims which would have been PCF liabilities and were *actually paid by Queen's* during the Medicare cost reimbursement period ending June 30, 1984.

On February 7, 1991, Queen's filed a complaint seeking judicial review of the Secretary's determination (as delegated to the HCFA) pursuant to 42 U.S.C. § 1395oo (f) (Supp.1991). On August 5, 1991, Queen's filed the present motion for summary judgment. On October 4, 1991, the Secretary filed a cross-motion for summary judgment.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 1395oo (f), the standard of review is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, which provides that judicial review is limited to determining whether the Secretary's decision was " 'arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law.' " *National Medical Enters. v. Sullivan,* 916 F.2d 542, 546 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2014, 114 L.Ed.2d 100 (1991) (quoting 5 U.S.C. § 706(2)(A) (1988) of the APA).

## DISCUSSION

The Social Security Act (the "Act") provides that a health care provider ("provider") is entitled to be reimbursed for the "reasonable cost" of health care services covered under Medicare and related to the care of Medicare beneficiaries. 42 U.S.C. § 1395f(b)(1) (1983); 42 C.F.R. § 413.9 (1990). The Act further provides:

*The reasonable cost of any services shall be the cost actually incurred,* excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to

be included, in determining such costs. . . .

42 U.S.C. § 1395x(v)(1)(A) (1983) (emphasis added).

## I. SELF–INSURANCE

■ A provider is entitled to reimbursement for the cost of malpractice insurance attributable to Medicare beneficiaries. *See generally* 42 C.F.R. § 413.56 (1990). Both commercial insurance premiums and self-insurance fund contributions are reimbursable malpractice insurance costs. *Id.* Section 2162.7 of the Manual sets forth the necessary conditions for a qualified self-insurance fund. Additionally, PRM section 2162.9 gives a provider a grace period of seventy-five additional days beyond the end of a fiscal year to establish a self-insurance fund and make contributions to the fund which would be recognized as reimbursable costs for such fiscal year.

■ The Secretary contends that at the end of the 1984 fiscal year Queen's was uninsured with respect to malpractice losses between $100,000 and $1,000,000 for occurrences prior to September 1, 1983. The Secretary asserts that after the PCF was repealed on May 31, 1984, Queen's did not purchase any replacement insurance or establish a proper self-insurance fund pursuant to section 2162.7 of the Manual before June 30, 1984, the end of Queen's 1984 fiscal year. Furthermore, Queen's did not establish its self-insurance fund until February 1985; well beyond the seventy-five day grace period provided by PRM section 2162.9. As a result of Queen's lack of malpractice insurance for occurrences previously covered by the PCF, the Secretary contends that Queen's was not entitled to seek reimbursement for any alleged malpractice insurance costs.

Queen's apparently does not disagree that it failed to comply with the self-insurance requirements of section 2162.7. Queen's SJ Memo at 20. Rather, Queen's claims that the unique factual circumstances present in this case result in an unfair application of section 2162.7. Queen's also contends that it was self-insured because it had sufficient funds or assets to cover the $3.4 million contingent liability even though it had not established a qualified self-insurance fund.

Nonetheless, as the Secretary correctly applied the applicable Medicare law in determining that Queen's had not established a self-insurance fund during the 1984 fiscal year or the following seventy-five days pursuant to the applicable Medicare requirements, the Secretary's decision was clearly not arbitrary or capricious. The court must affirm the Secretary's decision as to the self-insurance fund.

## II. ACCRUAL ACCOUNTING

■ Next, Queen's argues that even if it did not establish a qualified self-insurance fund, its claim for reimbursement for the Medicare portion of the $3.4 million contingent liability is mandated by generally accepted accounting principles ("GAAP") and the accrual accounting Medicare regulation. Both Queen's and the Secretary agree that the dispositive issue in this case is whether Queen's "actually incurred" malpractice insurance costs during the 1984 fiscal year in the amount of $3.4 million, the amount accrued by Queen's as a contingent liability on its June 30, 1984 financial statements. Queen's Opp. at 10–11; Secretary's Reply at 2. Queen's claims that their malpractice insurance costs were incurred during the 1984 fiscal year. The Secretary contends that Queen's could not have incurred any such costs since the self-insurance trust did not come into existence until February 1985.

Rejecting Queen's' GAAP and accrual accounting argument, the Secretary (actually the HCFA Administrator) determined: (1) GAAP is not mandated by the Medicare regulations and the specific Medicare policy regarding self-insurance funds is controlling; (2) the use of accrual accounting in this case results in a substantial windfall to Queen's which is not recoverable by Medicare; and (3) Queen's' contingent malpractice liabilities cannot accrue as an expense until they are settled and paid. HCFA Decision at 6.

Queen's contends that the Medicare Program was obligated to reimburse it for

Medicare's share of Queen's' $3.4 million insurance costs in the fiscal period ending June 30, 1984. Queen's alleges that the Secretary's decision was inconsistent with the Medicare regulation requiring accrual accounting. 42 C.F.R. § 413.24 (1990). This section indicates that health care providers who are seeking medicare reimbursement of allowable costs must provide adequate cost data which is based on the accrual basis of accounting. *Id.* § 413.24(a). Section 413.24 also provides:

> Under the accrual basis of accounting, revenue is reported in the period when it is earned, regardless of when it is collected, and expenses are reported in the period in which they are incurred, regardless of when they are paid.

*Id.* § 413.24(b)(2).

At the PRRB hearing, Queen's presented expert testimony that the $3.4 million sum in question was properly recorded on its books during the 1984 fiscal period. The testimony further indicated that the entry was in accordance with generally accepted accounting principles and accrual accounting. Therefore, Queen's maintains that because the $3.4 million contingent liability was consistent with generally accepted accounting principles and accrual accounting, it is entitled to Medicare reimbursement for the appropriate Medicare portion of the $3.4 million.

On the other hand, the Secretary argues that Queen's incurred none of the purported $3.4 million in malpractice insurance costs claimed during the 1984 fiscal year because Queen's incurred no actual malpractice insurance costs, and more importantly, incurred no obligation to pay such costs.[1] Secretary's Reply Memo at 3. Instead, Queen's $3.4 million contingent liability arose from its *lack* of malpractice insurance. Secretary's SJ Memo at 16.

Both parties have relied on the Fourth Circuit case *Charlotte Memorial Hosp. &*

*Med. Ctr. v. Bowen*, 860 F.2d 595 (4th Cir.1988). In that case, the Secretary relied on regulatory interpretations which departed from the GAAP approach in denying the provider's claim for reimbursement for payments made under deferred compensation plans. The Secretary contended that the forfeiture provisions in such plans create the risk that a hospital will never have to actually pay the doctors' deferred salaries. The Secretary further argued that under the GAAP approach the hospital could be reimbursed "for a cost it may not actually sustain, creating a risk that reimbursement will not 'accurately reflect the cost of patient care.'" *Id.* at 600. Overriding the Secretary's interpretations, the court determined that the GAAP approach accurately reflected the cost of patient care. The court noted that a doctor's rendition of services triggers a present obligation on the part of the provider to pay money on behalf of the doctor; the fact that a doctor elects to defer actual receipt of the money does not detract from the notion that the provider has incurred liability for services rendered.

This court finds that the HCFA Administrator's decision in the present case is consistent with the decision in *Charlotte Memorial*. In this case, unlike *Charlotte Memorial*, the GAAP as applied to Queen's' $3.4 million *contingent* liability does not accurately reflect the cost of patient care.

The court finds somewhat conflicting Ninth Circuit precedent on this issue. *See National Medical Enters. v. Sullivan*, 916 F.2d 542 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2014, 114 L.Ed.2d 100 (1991); *National Medical Enters. v. Bowen*, 851 F.2d 291 (9th Cir.1988). In *NME v. Bowen*, the Secretary argued that return on equity should not be considered as part of ending equity capital for the purpose of calculating Medicare reimbursements in spite of the contrary view applying GAAP.

---

**1.** The Secretary contends that the controlling regulation is 42 C.F.R. § 413.56 regarding "malpractice insurance costs." Secretary's SJ Memo at 9. The court does not believe that section 413.56 governs the outcome of this case for the following two reasons. First, the HCFA Administrator did not rely on section 413.56. Second, section 413.56 addresses methods for apportioning malpractice insurance costs between Medicare and non-Medicare patients. Apportionment is not at issue in the present case. In addition, the court notes that the apportionment scheme of section 413.56 has recently been invalidated. HCFA Ruling 91–1.

Rejecting the Secretary's contention that accounting principles are irrelevant, the Ninth Circuit stated: "Regulations regarding how hospitals should calculate and record their costs are integral parts of the set of Medicare regulations regarding what is a 'reasonable' (reimbursable) cost for the purpose of the Act." *NME v. Bowen*, 851 F.2d at 294.[2] The Ninth Circuit then overturned the Secretary's decision because there was no specific regulation or conceptual reason supporting the Secretary's view.

In *NME v. Sullivan*, the Ninth Circuit's most recent case on the issue at hand, the Ninth Circuit seemed to adopt a new view of the relevance of GAAP. In that case, the court upheld the Secretary's decision to deny reimbursement for stock maintenance costs. With respect to the effect of the GAAP, the Ninth Circuit explained:

> Nor is it probative, as NME contends, that [GAAP] include stock maintenance costs in a corporate provider's allowable general and administrative costs. **Such procedures promote uniform record-keeping; they do not prescribe reimbursable costs.** *See AMI [v. Secretary of Health, Education and Welfare ]*, 466 F.Supp. [605] at 623–24 [ (D.D.C.1979) ] (noting that the "regulation is directed at the type of financial data and reports required of providers; it is not a regulation affecting the substantive provisions of the program as to what constitutes reimbursable costs.").
>
> Moreover, as our circuit has noted, when [GAAP] "do not accurately reflect the cost of running a business, the Secretary reserves the right to prescribe different accounting practices." *North Clackamas Community Hospital v. Harris*, 664 F.2d 701, 706 n. 16 (9th Cir.

1980). Such principles support the Secretary's denial decision.

*NME v. Sullivan*, 916 F.2d at 547 (bold added).

■ As *NME v. Sullivan* represents the Ninth Circuit's most recent outlook on GAAP and reimbursable Medicare costs, this court finds that decision controlling. Moreover, this court is persuaded by the rationale of *NME v. Sullivan* that GAAP are necessary to promote uniform records and data to be submitted to the Secretary for the purpose of determining reimbursement. However, the GAAP were obviously designed for accounting purposes, not for determining what health care costs are reasonable and should be reimbursable under Medicare. Thus, although the data and records submitted to the Secretary should conform with GAAP, the fact that GAAP indicated that a particular item should be listed as a cost or expense does not necessarily mean that the cost should be reimbursable under the Social Security Act.

This court finds these same principles to be applicable to accrual accounting which is required for cost data under 42 C.F.R. § 413.24(a).[3] Moreover, the court finds that the Secretary's decision is consistent with the general principle of accrual accounting. Under accrual accounting, expenses are reported in the period in which they are incurred regardless of when they are paid. 42 C.F.R. § 413.24(b)(2). The Secretary argues that in the 1984 fiscal year Queen's never incurred any malpractice insurance expenses related to the malpractice occurrences formerly covered by PCF. The Secretary contends that Queen's did not incur the malpractice insurance costs at issue until the self-insurance trust

---

**2.** *See also Villa View Community Hosp. v. Heckler*, 720 F.2d 1086, 1093 n. 18 (9th Cir.1983) ("where the Secretary has not prescribed different accounting practices by regulation, the Secretary must apply [GAAP] to determine whether a particular cost claimed by a provider is reimbursable under the Medicare Act"); *HCA Health Servs. of Midwest v. Bowen*, 869 F.2d 1179, 1182 (9th Cir.1989) (following *Villa View* and *NME v. Bowen* ).

**3.** Queen's argues that if a Manual provision (the self-insurance fund requirements) and a regula-

tion (accrual accounting provision) conflict, the regulation takes precedence. In the present case, however, the court finds that the Manual and the regulation do not conflict. The accrual accounting regulation merely addresses the required format for providers' cost data which is submitted for reimbursement purposes, whereas the self-insurance fund provision of the Manual specifically regulates whether certain expenses are reimbursable.

was established in February of 1985. Further, to the extent that Queen's may be said to have an "argument" with *some* merit, that is likewise true of the Secretary's decision. This court's review process is a very narrow one as indicated above. Under this narrow review standard it is clear to this court that the Secretary's decision is not arbitrary, capricious, an abuse of discretion or not otherwise in accordance with law.

## III. REIMBURSEMENT IN 1985 FISCAL YEAR

Queen's argues that if the costs are not permitted in fiscal 1985, such costs should be allowable in the 1985 fiscal year. As this argument was not addressed by the HCFA Administrator, the court does not consider this contention.

## CONCLUSION

For the reasons above, the court GRANTS the Secretary's cross-motion for summary judgment and DENIES Queen's' motion for summary judgment.

IT IS SO ORDERED.