Sewickley Valley Hospital, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Argued October 6, 1983, before Judges Williams, Jr., Barry and Blatt, sitting as a panel of three.

*Sanford V. Teplitzky, Ober, Grimes & Shriver,* with him, *Herman S. Harvey, Jr., Blaxter, O'Neill, Houston and Nash,* for petitioner.

*Jeffrey Gonick,* Assistant Counsel, for respondent.

Opinion by Judge Barry, April 3, 1984:

The issue in this case involves the correctness of a decision of the Department of Public Welfare (DPW) which required petitioner Sewickley Valley Hospital (Hospital) to revise allowable costs associated with a financing transaction in accordance with reimbursement principles developed under the Medicaid Program. DPW required the Hospital to include the total loss on defeasance of debt or advance refunding[1] in

---

[1] "Defeasance" refers to "legal satisfaction of debt and release of any related liens pursuant to a provision in the debt instrument, even though the debt may not be formally retired." 47 Fed. Reg. 38,868 n. 1 (1982) (to be codified in 17 C.F.R. Part 211).

"Advance refunding" or "bond defeasance" or "defeasance of debt" is a technique through which the debtor (hospital or health care facility) can satisfy its obligation to pay principal and interest on existing bonds by not "calling" then (*i.e.,* paying them off), but by depositing into an irrevocable trust, government or government-

the amount of $1,765,507.00 in fiscal year 1977 rather than permitting the Hospital to amortize the loss on defeasance over the length of the new bond issue. This treatment, which included all of the loss in the year of defeasance, caused the Hospital to exceed its routine cost limitations, which resulted in the Hospital losing forever the amount of the loss which exceeded the cost limits.

On August 1, 1975, Sewickley Valley Authority issued $12,000,000.00 of gross revenue bonds with an average interest rate of 9%. On April 1, 1977, the authority issued $12,235,000.00 of gross revenue bonds and $7,030,000.00 of Special Obligation Refunding Bonds to pay off the August 1975 issue. The later issue had an average interest rate of 6.23%, which resulted in interest savings to Sewickley Valley Hospital of $3,281,713.00.[2] However, due to the fact that the

---

guaranteed securities in an amount which, together with the interest which they will generate, is calculated to meet the principal and interest payments on the bonds as they come due. This transaction is called a "trust" type, as opposed to the "assumption" type, which, instead of a trust, requires a third-party group of investors to assume the principal and interest payments in return for a current cash payment. 47 Fed. Reg. 38,868 (1982) (to be codified in 17 C.F.R. Part 211).

[2] Refinancing of existing indebtedness generally occurs where either: (a) interest rates have declined; (b) taxable indebtedness is being refinanced with tax exempt bonds at lower rates; (c) existing mortgage indebtedness must be refinanced in order to give a new financing first priority; or (d) the provider seeks to remove restrictions embodied in existing financing documents which restrict the provider's operations or prevent a corporate reorganization. Refunding a prior issue of tax exempt bonds issued to finance a project for a for-profit provider are subject to the limitation imposed by Treas. Reg. Section 1.1037(e), which requires that the prior bond issue be repaid within six months of the date of closing on the refunding issue, unless the prior issue had an original term of less than three years. See PBI publication No. 1983-241 "A Basic Introduction to Medicare and Medicaid Reimbursement Law."

Hospital had to borrow an amount of money which exceeded the balance of the debt outstanding on the 1975 bonds in order to obtain the lower interest rate on the later issue, the Medicare and Medicaid programs treat the additional principal owed on the new bonds as a loss caused by the defeasance. The loss on defeasance of debt amounts to $1,765,507.00.

Sewickley Valley Hospital participates in the Pennsylvania Medical Assistance Program as a provider of inpatient hospital services. The Hospital reports its costs for Medical Assistance purposes on a July 1-June 30 fiscal year.

The Hospital amortized the loss on defeasance of the bonds over a period of years and then claimed as an allowable cost for the cost reporting period ending June 30, 1977, June 30, 1978, and June 30, 1979, that portion of the loss on defeasance which applied to each reporting period. DPW disallowed amortization of the loss on defeasance, requiring instead that the entire loss be recognized in the year in which the refinancing occurred. Therefore, the auditors included the loss of $1,765,507.00 in the Hospital's cost for the fiscal year ending June 30, 1977. On appeal to the Secretary of Public Welfare, the action of the auditors was upheld. Hence, the Hospital appears before us seeking reversal of the decision of the Office of Hearings and an order granting amortization of the loss on refinancing over the life of the 1977 bond issue.

Hospitals participating in the Pennsylvania Medical Assistance Program (Medicaid) are reimbursed according to Medicare reimbursement principles. Prior to February, 1977, the Medicare Provider Reimbursement Manual (H.I.M. 15) did not address reimbursement issues relating to loss on defeasance in the refinancing of bonds. In February, 1977, H.I.M. 215 titled "Recall of Bonds Before Maturity" was pub-

lished. This publication addresses the subject of loss on defeasance of debt at Section 215.1.[3] This section also limits the periods affected by the new reimbursement policies and provides that H.I.M. 15 §215 applies only for cost reporting periods *beginning after* December 31, 1976. The fiscal year in question in this appeal is fiscal year July 1, 1976-June 30, 1977. Therefore, on its face, only six months of the fiscal year in question would qualify for specific treatment as specified in Section 215.1 of H.I.M. 15. It is clear, however, that we cannot simply allow six months of loss to be claimed in the year in which it occurs and the remaining six months to be amortized over the life of the refinancing. The Foreword to the Medicare Provider Reimbursement Manual states that "[f]or any cost situation that is not covered by the manual's guidelines and policies, generally accepted accounting principles should be applied." A.B.P. (Accounting Principles Board) Opinion No. 26 of October 1972 entitled "Early Extinguishment of Debt" deals with generally accepted accounting principles with respect to extinguishment of debt during the period in question. In Paragraph 20 of that Opinion, it is stated that "[g]ains and losses should not be amortized to future periods." Paragraph 21 further provides that "a difference between a cash acquisition price of the debt and its net carrying amount should be recognized

---

[3] The section of the Medicare Provider Reimbursement Manual at issue reads in its entirety:

Treatment of Debt Cancellation Costs.—When costs incident to debt cancellation plus the actual cost incurred on the bond during the provider's reporting period *are less than* the amount of interest cost and amortization expense that would have been allowable in that period had the indebtedness not been cancelled, then the cost of debt cancellation, to the extent reasonable, is allowable in the year incurred. (Emphasis in original.)

currently in income in the period of extinguishment as losses or gains.''

It is DPW's position on the issue of costs of defeasance in the refinancing of bonds that matters of reimbursement to hospitals which are participants in the Medical Assistance Program are governed by federal statutes authorizing those regulations contained in the Medicare Provider Reimbursement Manual. DPW contends that since there was no regulation specifically addressing the issue of loss on defeasance in bond refinancing applicable to the period in question, general principles of accounting apply, as provided in the Foreword of the Provider Reimbursement Manual.

During the period in question, general principles of accounting were issued by the Accounting Principles Board and applied by DPW to the instant case. By implication it is clear that, conversely, where Medicare rules, regulations and guidelines do exist, they should be given weight. The mandate of the Medicare Program, and consequently Pennsylvania Medicaid, is to pay actual costs, which costs must be reasonable, necessary, and related to patient care. This general situation is covered in 42 C.F.R. 405.451, and interpreted in what the Hospital submits is a clarification of existing substantive policy in *Ravenswood Hospital Medical Center v. Blue Cross Association/Health Care Service Corporation,* C.C.H. Medicare and Medicaid Guide ¶31,945. The provider in *Ravenswood* incurred a loss as a result of advance refunding. The provider sought to claim the loss in the year of the refinancing. The fiscal intermediary in that case relied upon Section 215.1 to require amortization of the loss rather than claiming it in the year of the refinancing. The Board held in favor of the provider. Upon review of the Board's decision, however, the Deputy Admin-

304

istrator of the Health Care Financing Administration reversed the Board's decision. C.C.H. Medicare and Medicaid Guide ¶32,044. The Deputy Administrator's decision recognized that

> [t]here are, however, differences on GAAP [Generally Accepted Accounting Principles] and Medicare Cost Reporting caused by the differing purposes of each undertaking. GAAP is concerned with providing a consistent reporting of an entity's financial position for investors and management. Medicare Cost Reporting, meanwhile, is concerned with determining the reasonable cost of providing services to medicare beneficiaries during each cost reporting period under 42 C.F.R. 405.451.

*Id.* at 10,023. The Deputy Administrator continued:

> A large loss incurred by refinancing is not a cost of rendering patient care during only the year of the refinancing. The provider's expectation is to recover the loss and reduce financing costs through lowered interest rates over the term of the new financing. . . . [B]oth [the financing and the refinancing] related to a construction project which will benefit the provider over a period of years. The financing is an obligation lasting for a number of years. As part of the overall costs of the construction, the loss on the restructuring is more closely related to the years over which the refinancing extends then [sic] to the year in which the refinancing occurred. Accordingly, this loss is a cost of rendering patient care over several years.

> This treatment of a loss on refinancing is consistent with Medicare's treatment of other losses from the disposal of assets . . . . This

treatment of losses is also not necessarily in agreement with GAAP, which sometimes may allow a full loss to be recognized immediately.

Such proration or amortization is required to prevent abuse of the Medicare program. By matching such losses to actual medicare utilization related to the loss, the program is protected from any attempt to obtain reimbursement for a large loss in a year of unusually high medicare usage. Further, the program is protected from making a current future payment of reimbursement attributable to future years and then having the provider drop out of the program before services are rendered to medicare beneficiaries in these future years.

In light of the policy expressed in 42 C.F.R. 405.415(f), SEC. 215.1 of the Provider Reimbursement Manual (HIM-15) is a reasonable interpretation of the treatment to be accorded to refinancing losses. This Manual section allows immediate recognition of relatively small losses, but spreads large losses over future years. . . . [R]eimbursement of the loss over a period of years, therefore, will more fairly allocate the provider's refinancing costs.

*Id.* at 10,023-4.

DPW contends that the Hospital's reliance on *Ravenswood* is misplaced because that case involved a refinancing which occurred in 1978, well after the effective date of Section 215.1. Our reading of that case, however, belies any notion that it is inapplicable to the instant case. It is evident that the case interprets the general rules and regulations of the Medicare Program in determining the treatment to be accorded a refinancing transaction. Because we conclude that *Ravenswood* involves an interpretation of

the overall Medicare regulations and compares the proposed treatment of a loss on refinancing with Medicare's treatment of other losses from the disposal of assets under 42 C.F.R. 405.415(f), DPW's argument is without merit. We are cognizant of the fact that *Ravenswood* involves Medicare provisions, while the instant case involves reimbursement of costs of Medicaid. We can, however, perceive no basis for treating Medicaid reimbursement of these costs differently from that of Medicare. The federal Medicare program requires amortization with respect to losses incurred in refinancing a bond issue. Because the Medical Assistance Program is a cooperative federal-state program administered pursuant to federal statutes and regulations and subject to federal supervision, 42 U.S.C. §§1396, 1396a, and 1396b, we are of the opinion that amortization is appropriate in Medicaid reimbursement as well as Medicare.

DPW submits that we are bound by our decisions that in the absence of flagrant abuse of discretion or a purely arbitrary execution of duty the Court may not disturb the decision of an administrative agency, *Budzinski v. Department of Public Welfare,* 39 Pa. Commonwealth Ct. 176, 394 A.2d 1333 (1978). The agency has broad discretion with respect to its interpretation of its regulations, *Spicer v. Department of Public Welfare,* 58 Pa. Commonwealth Ct. 558, 428 A.2d 1008 (1981). Further, DPW points to *Department of Public Welfare v. Forbes Health System,* 492 Pa. 77, 422 A.2d 480 (1980), in which case the Supreme Court held that an administrative agency's interpretation of its own regulations is of controlling weight unless it is plainly erroneous or inconsistent with the regulations or inconsistent with the statute under which the regulations are promulgated. While we agree that these principles should be present in our

deliberations, we also recognize that Medicare rules take precedence over general accounting rules. As stated in *North Clackamas Community Hospital v. Harris,* 664 F.2d 701, 706 n. 16 (9th Cir. 1980): "The Secretary normally follows generally accepted accounting practices, 42 C.F.R. §405.406(a) (1979), but when those practices do not accurately reflect the cost of patient care, as opposed to the cost of running a business, the Secretary reserves the right to prescribe different accounting practices." *See* 41 Fed. Reg. 46,-292 (1976). The United State Supreme Court has held that the interpretation of the agency charged with administration of the statute is entitled to "subsantial deference." *Quern v. Mandley,* 436 U.S. 725, 738 (1978); *New York State Department of Social Services v. Dublino,* 413 U.S. 405, 421 (1973). That Court stated that the decision of the agency should not be disturbed unless it is " 'so entirely at odds with fundamental principles of correct accounting' . . . as to be the expression of a whim rather than an exercise of judgment." *American Telephone and Telegraph v. United States,* 299 U.S. 232, 236-37 (1936). We have concluded that were we not to apply the rationale as set forth in *Ravenswood,* we would be ignoring the mandate of case law in this area.

Finally, DPW submits that, at the hearing in this case, it introduced uncontradicted expert testimony to the effect that during the period under consideration, July 1, 1976 through June 30, 1977, APB Opinion No. 26 set forth generally accepted accounting principles with respect to extinguishment of debt, and provided that gains or losses on extinguishment of debt should be recognized in the period of extinguishment and not amortized to future periods; DPW therefore concludes that the auditors who required the Hospital to include its entire loss on defeasance of the bonds in the July

308

1, 1976-June 30, 1977 cost reporting period were correct. As we have discussed, reference to generally accepted accounting principles is not appropriate when that reference results in treatment inconsistent with the overriding Medicare regulations. The regulations at issue here are those of the federal government and not of the DPW, so the administrative decision below is not entitled to "substantial deference" to the extent that it differs from the interpretation accorded those regulations by the Medicare Program as set forth in *Ravenswood*.

Therefore, the decision of the Department of Public Welfare is reversed and an order is entered permitting the Hospital to amortize the loss on refinancing over the life of the 1977 bond issue.

ORDER

AND Now, April 3, 1984, it is ordered that the decision of the Department of Public Welfare in the above-captioned case is reversed and Sewickley Valley Hospital is permitted to amortize the total loss on defeasance of debt of $1,765,507.00 over the life of the 1977 bond issue.

